No. 79,672

In the Matter of the Appeal of University of Kansas School of Medicine—Wichita Medical Practice Association from a Decision of the District Court of Shawnee County, Kansas.

(973 P.2d 176)

Opinion filed
February 5, 1999.

*Richard D. Greene,* of Morris, Laing, Evans, Brock & Kennedy, Chtd., of Wichita, argued the cause and was on the brief for appellant University of Kansas School of Medicine—Wichita Medical Practice Association.

*Patricia J. Parker,* assistant county counselor, argued the cause and was on the brief for appellee Board of County Commissioners of Sedgwick County.

The opinion of the court was delivered by

DAVIS, J.: The issue raised by this appeal is one of first impression involving a claimed property tax exemption under the provisions of K.S.A. 79-201 *Ninth.* Specifically, the question is whether a not-for-profit corporation which leases property to another not-for-profit corporation for below fair market value, which second not-for-profit corporation then uses the property for predominantly humanitarian purposes, is entitled to exemption where both the owner-lessor and lessee satisfy all the requirements of K.S.A. 79-201 *Ninth.* Contrary to the decision of Board of Tax Appeals (BOTA) and the district court, we conclude that under the particular facts here, exemption is warranted.

The case presents itself in a rather unusual fashion. Before BOTA, before the district court, and before this court on petition for review, the Sedgwick County Commissioners agreed with the appellant that the property was entitled to tax exemption. In its brief before this court, the county commissioners note:

"when the evidence regarding the use of the subject property is analyzed within the perimeters of K.S.A. 79-201 *Ninth,* and applicable case law, it appears the Appellant's property is entitled to said exemption. It should be noted that the Courts have not construed K.S.A. 79-201 *Ninth's* provisions regarding 'substantial and predominant use' and BOTA acknowledged it lacked guidance from the

Courts in its effort to define substantial and predominant use. However, it is also noteworthy to consider the *Kansas Courts'* relaxation of the 'exclusive use' test, and the expanding definition of 'educational use' found in other exemption statutes. See *e.g.* K.S.A. 79-201 *Second*, and K.S.A. 79-201b *First* and *Second.*"

The University of Kansas School of Medicine—Wichita Medical Practice Association (WMPA) is the owner-lessor of the property for which exemption is claimed. It is a Kansas not-for-profit corporation and certified by the Internal Revenue Service (IRS) as a 501(c)(3) charitable organization. Its board of directors consists of doctors who teach medicine at the University of Kansas School of Medicine—Wichita (University). The WMPA is not part of the University. However, the WMPA was set up to further the mission of the University in providing health care, teaching medical students and residents of the University, and providing the faculty of the University the opportunity to maintain their skills while teaching.

The WMPA operates its own primary care clinic upon University property which is open to the public. The clinic provides primary care for approximately 105 patients a day. In addition, the WMPA fosters the creation of other clinics in the Wichita area for primary and preventive care, and aids in the operation of the clinics established. Its articles of incorporation provide in part that the WMPA is to

"engage in the continuous active conduct of medical education, medical research and medical care primarily in space located within the University of Kansas School of Medicine—Wichita in conjunction with and utilizing the facilities of such School of Medicine (including equipment, case studies, etc.) on a continuing basis. The principal purposes or functions of the corporation shall include the instruction and training of students, undergraduate, graduate and enrolled in the University of Kansas School of Medicine—Wichita Medical Practice Association pursuing a course of medical education offered by the University of Kansas, the conduct of investigations, research, experiments and studies to discover, develop or verify knowledge relating to the causes, diagnosis, treatment and the prevention or control of physical or mental diseases and impairments to man and the providing of medical care through its professional staff performing clinical services."

The Wichita Primary Care Center (Center) is the lessee of the property for which exemption is claimed. It is also a Kansas not-for-profit corporation and an IRS-certified 501(c)(3) charitable or-

ganization. The Center was created by the WMPA as an extension of the WMPA mission. The Center is a separate entity with a separate board of directors. However, one member of the board of directors of the WMPA serves as a board member of the Center. The Center operates a primary care clinic in Wichita and is designed to serve low income and medically underserved patients. Thirty percent of the Center's patients are very low-income individuals who do not have any support from Medicare or Medicaid. Another 50% are low-income individuals who are subsidized by Medicare or Medicaid. The balance of patients have adequate health insurance. Approximately 10% of the patients speak very little or no English.

The purpose of the Center is to provide a medical facility for patients that may not be otherwise served. It is designed to be a place where patients receive primary health care, preventive health care, and access to tertiary care such as the hospital, surgeon, and/or testing that patients might not otherwise access. The Center attempts to change people's patterns of accessing health care for primary and preventive health care.

The Center is set up as a Federally Qualified Health Center (FQHC) and provides medical care for low income and underserved populations on a sliding scale. As a FQHC, the Center receives a reimbursement advantage with the Medicare and Medicaid programs. Once the Center has established a rate of cost of seeing a patient and that cost is approved by Medicare or Medicaid, reimbursement to the Center is based on the number of encounters as opposed to typical fee for service schedules in Medicare and Medicaid reimbursement. In order to maintain FQHC status, at least seven persons on the Center's thirteen-member board of directors are required to be actual patients of the facility. The remaining six members, only three of which can derive their income from the medical field, are drawn from the community.

Through personal interviews with prospective patients and a sliding fee schedule, the Center attempts to determine and remove the barriers that medically underserved and low income patients typically encounter. The Center arranges a referral service for patients who need immediate hospitalization and surgery but who

would avoid these services because of the economic barrier. These services are provided at no cost to the patient or on a sliding scale depending upon the financial condition of the patient. No patient is refused service.

The primary difference between the Center and a private primary care clinic is the mix of patients. The numbers of patients who do not pay, or pay very little, is high compared to a private primary care practice. The number of no-shows in the Center is also high. Patients are seen by physicians serving on the faculty of the medical school, together with medical students, interns, and residents who are supervised by a physician. The Center is able to provide a unique role in the delivery of primary and preventative health care to the medically underserved in the Wichita community.

The Center's articles of incorporation provide in part that it will

"[p]rovide primary health care services to the citizens of Kansas; promote improved health status and well being of citizens of Kansas; care for the sick and injured without regard to race, sex, color, political or religious beliefs, country of national origin, or ability to pay; promote a cooperative working relationship with the University of Kansas School of Medicine—Wichita in the development of medical care delivery systems designed to enhance the health and welfare of the citizens of Kansas: and to promote such other related charitable and educational endeavors as may be permitted under Section 501(c)(3) of the Internal Revenue Code."

The Center was temporarily housed as a clinic in space inside a building operated by the University. The WMPA began looking for a suitable site to house the Center. The site needed to be located in the vicinity of the patients who would use the clinic, in a location where barriers to primary health care exist, such as language, low income, and racial mix.

The property for which exemption is claimed satisfied the above requirements. It was a stand-alone medical facility that had been designed and built for a group of surgeons years ago, located at 1125 North Topeka in Wichita. It consists of approximately 5000 square feet with ample off-street parking. However, the Center was not in a position to buy the property. The WMPA approached the St. Francis Via Christi Health System to inquire if it would buy

the building and lease it to the Center. However, after negotiations, the WMPA determined that the lease rate was too high. Thus, the WMPA chose instead to purchase the property out of its own reserves and lease it back to the Center.

The WMPA purchased the property in the summer of 1994 for the express purpose of leasing the facility to the Center. The WMPA and the Center entered into a nonresidential lease on September 30 for the term of 30 months beginning October 1, 1994, and expiring April 1, 1997. Under the lease, the Center pays rent in the amount of $8.25 per square foot per month, which amounts to $3,644 per month. The Center is also required to pay such real estate taxes as may be assessed against the property. These taxes are estimated to be approximately $1.60 per square foot per year. It should be noted that this provision regarding payment of taxes is not a binding obligation upon the Center. The Center is responsible only in the event taxes are required to be paid by the WMPA. In addition to other standard conditions, the lease prohibits the use of the property for any other purpose than the operation of medical offices.

Administrative leadership for the Center is provided by the administrator of the WMPA, who is a co-administrator for the Center. Through contractual agreements, the Center uses the WMPA facilities for billing, accounting, and related services, and pays for these services. While the physicians who staff the clinic are not employees of the Center, all other personnel working at the Center are employees of the Center.

The Center contracts with the WMPA for physician services. The Center pays the WMPA a below-market rate for the physicians who staff the Center. The physicians who see patients at the Center are faculty members of the University and also employees of the WMPA. For their work in the Center and other work on behalf of the WMPA, the WMPA pays an amount equal to 7½% of their faculty salary. Thus, the physicians who teach at the University and work at the Center receive compensation from the State as members of the faculty of the University and compensation from the WMPA in an amount of 7½% of their salary for their services at the Center.

The WMPA is responsible for maintaining the clinic property of the Center. The rent paid by the Center, $8.25 per square foot, is below fair market value, which evidence establishes is $10 to $12 per square foot. The WMPA uses 22% to 23% of rental income for the operation and for repairs to the facility. The remainder becomes part of the budget of the WMPA and either goes into its reserves to be utilized as needed for sustaining the WMPA during periods of financial hardship where revenues collapse and expenses continue, or is used in furtherance of the humanitarian services that the WMPA provides.

The WMPA sought a tax exemption for the property under K.S.A. 79-201 *Ninth*, which provides in pertinent part:

"All real property and tangible personal property actually and regularly used by a community service organization for the predominant purpose of providing humanitarian services, which is owned and operated by a corporation organized not for profit under the laws of the state of Kansas or by a corporation organized not for profit under the laws of another state and duly admitted to engage in business in this state as a foreign not-for-profit corporation if: (a) The directors of such corporation serve without pay for such services; (b) the corporation is operated in a manner which does not result in the accrual of distributable profits, realization of private gain resulting from the payment of compensation in excess of a reasonable allowance for salary or other compensation for services rendered or the realization of any other form of private gain; (c) no officer, director or member of such corporation has any pecuniary interest in the property for which exemption is claimed; (d) the corporation is organized for the purpose of providing humanitarian services; (e) the actual use of property for which an exemption is claimed must be substantially and predominantly related to the purpose of providing humanitarian services, except that, the use of such property for a nonexempt purpose which is minimal in scope and insubstantial in nature shall not result in the loss of exemption if such use is incidental to the purpose of providing humanitarian services by the corporation; (f) the corporation is exempt from federal income taxation pursuant to section 501(c)(3) of the internal revenue code of 1986 and; (g) contributions to the corporation are deductible under the Kansas income tax act. As used in this clause, 'humanitarian services' means the conduct of activities which substantially and predominantly meet a demonstrated community need and which improve the physical, mental, social, cultural or spiritual welfare of others or the relief, comfort or assistance of persons in distress or any combination thereof including but not limited to health and recreation services, child care, individual and family counseling, employment and training programs for handicapped persons and meals or feeding programs."

BOTA Decision

BOTA denied the WMPA request for exemption. BOTA analyzed the requested exemption under the provisions of K.S.A. 79-201 *Ninth* from the perspective of the corporation requesting the exemption, the WMPA. BOTA began its analysis of the question and its decision by stating that "the Board strictly construes applications for exemption and all doubts are resolved against the applicant." In adopting this approach, BOTA relied upon earlier decisions of this court in interpreting Kansas constitutional and statutory tax exemption provisions. The decisions relied upon by BOTA involved questions of whether the property claimed as exempt was "exclusively used" for an expressed constitutional or statutory purpose. See *T-Bone Feeders, Inc. v. Martin,* 236 Kan. 641, 645-46, 693 P.2d 1187 (1985).

The statute we consider in this case does not involve the question of "exclusive use" but rather involves a question of actual use "for the predominant purpose of providing humanitarian services." K.S.A. 79-201 *Ninth.* We do not depart from our earlier decisions and the fundamental rules and legal principles established as guidelines to be applied when examining tax exemption statutes, which are quoted in part in the BOTA decision:

"(1) Taxation is the rule; exemption is the exception. All doubts are to be resolved against exemption and in favor of taxation. [Citation omitted.]
"(2) Constitutional and statutory provisions exempting property from taxation are to be strictly construed. [Citations omitted.]
"(3) The burden of establishing exemption from taxation is on the one claiming it. [Citation omitted.]" 236 Kan. at 645-46.

However, because we deal with a newly enacted exemption based upon other than "exclusive use," we may not ignore the very fundamental rule of statutory interpretation. The intent of the legislature, where it can be ascertained, governs the construction of the statute, and it is the function of the court to interpret a statute to give it the effect intended by the legislature. See *In re Tax Exemption Application of City of Wichita,* 255 Kan. 838, 842, 877 P.2d 437 (1994). The rule of strict construction is subservient to the fundamental rule of statutory construction, which requires that the intent and purpose of the legislature govern. *In re Tax Appeal*

*of Collingwood Grain, Inc.*, 257 Kan. 237, 246, 891 P.2d 422 (1995).

BOTA acknowledged that it had no guidance from this court on "predominant use" but failed to give any consideration to the intent of the legislature in its adoption of K.S.A. 79-201. BOTA also gave very little consideration to the Center's actual and regular use of the property for which exemption is claimed. According to the provisions of K.S.A. 79-201 *Ninth,* we may not ignore this aspect of the case.

In denying the requested exemption, BOTA concluded:

"12. With respect to requirements (a) and (c) of K.S.A. 1995 Supp. 79-201 *Ninth,* the Board is not convinced that the directors of [the WMPA] serve without pay and without a pecuniary interest in the medical clinic. Testimony indicated that all of the directors of [the WMPA] are physicians, some of whom see patients in the medical clinic. Physicians who see patients at [the Center] are full time faculty members of the Kansas University Medical School and, also, are considered employees of [the WMPA]. Thus, they receive two checks: one from the University of Kansas and the other from [the WMPA]. [The WMPA] collects fees from [the Center] for the physicians' time pursuant to contractual agreement. Although it is clear that the contractual fees collected are not distributed directly to the physicians, the fees become part of [the WMPA]'s operating revenue from which the physicians' [the WMPA] salaries are derived. Thus, though not directly, those directors of [the WMPA] who are physicians working in the clinic receive pay for their services, thereby giving them a pecuniary interest in the operation of the medical clinic."

BOTA also noted that it was not convinced that the WMPA was organized for the purpose of providing humanitarian services as required by K.S.A. 79-201 *Ninth* (d). BOTA stated that one of the original purposes of the WMPA was to provide a way for physicians teaching at the school to supplement their salaries and that this purpose "cannot be ignored by the Board in its determination whether the subject property qualifies for an exemption."

Finally, BOTA determined that while the Center was physically using the property, the WMPA was also using the property by leasing it, which generated revenue. According to BOTA, while there was testimony that the revenue was used for humanitarian purposes, the evidence was not sufficient to allow it to determine

whether the purposes for which the money was used qualified as humanitarian services as required by K.S.A. 79-201 *Ninth* (e).

### District Court

On petition for judicial review, the district court agreed with BOTA, although for different reasons. The court determined that K.S.A. 79-201 *Ninth* was "ambiguous as to whether the 'owned and operated' requirement refers to the property or to the community services organization or both." The actual language of this provision is: "All real property and tangible personal property actually and regularly used by a community service organization for the predominant purpose of providing humanitarian services, which is owned and operated by a corporation organized not for profit." Applying strict construction, the court concluded that in order to qualify for the exemption the legislature intended to require a corporate property owner to dedicate the use of the property to providing humanitarian services and to also be the humanitarian service provider on the exempt property. The district court reasoned that if the legislature had intended otherwise, the disjunctive "or" could have been placed between "owned" and "operated."

Like BOTA, the district court, relying upon earlier decisions of this court interpreting Kansas constitutional and statutory tax exemptions requiring that the property be "exclusively used" for an expressed constitutional or statutory purpose, applied strict construction. With the exception of considering the expressed statutory language of the new provisions contained in K.S.A. 79-201 *Ninth*, the district court gave little, if any, consideration in its order denying the exemption to the fundamental rule of statutory construction that the intent of the legislature, where it can be ascertained, governs the construction of the statute, and it is the function of the court to interpret a statute to give it the effect intended by the legislature.

Relying upon past precedent from this court concerning the constitutional and statutory conditions for the exemption of property "exclusively used" for charitable purposes, the district court noted that the renting of property constitutes a simultaneous use of the property by the lessor and lessee which would bar a claim of ex-

clusive use for exempt purposes. "Renting property is a nonexempt use of the property." See *Board of Wyandotte County Comm'rs v. Kansas Ave. Properties*, 246 Kan. 161, 786 P.2d 1141 (1990); *In re Board of Johnson County Comm'rs*, 225 Kan. 517, 592 P.2d 875 (1979). The district court, in looking at the humanitarian services exception, stated that the substantial rent received by the WMPA would certainly preclude the renting of the property from constituting a "nonexempt purpose which is minimal in scope and insubstantial in nature," as allowed by K.S.A. 79-201 *Ninth* (e).

In holding that the WMPA rental of the property to the Center did not qualify as a humanitarian service, the court concluded:

"A review of the record does not reveal sufficient evidence from which BOTA or the Court can determine the scope of the [WMPA]'s programs and activities, its financial structure, the establishment and reasonableness of the compensation paid to its member doctors, to analyze its books and records which might show the accrual of profits or weigh the humanitarian services it provides against its other non-exempt activities, if any, besides purchasing and renting real estate. While providing health care is generally considered humanitarian, neither the BOTA nor the courts are required to accept that the [WMPA] is per se a humanitarian organization for purposes of a property tax exemption because its members are doctors and because it provides medical services as part of its business activities."

Thus, the district court affirmed BOTA's denial of the exemption.

## Standard of Review

BOTA is a state agency, and under K.S.A. 74-2426(c), it is subject to judicial review under the Act for Judicial Review and Civil Enforcement of Agency Actions, K.S.A. 77-601 *et seq*. In reviewing a decision of BOTA, this court makes the same review as the district court in its review of BOTA's final order. Under K.S.A. 77-621(c), this court may grant relief if it determines:

"(1) The agency action, or the statute or rule and regulation on which the agency action is based, is unconstitutional on its face or as applied;

"(2) the agency has acted beyond the jurisdiction conferred by any provision of law;

"(3) the agency has not decided an issue requiring resolution;

"(4) the agency has erroneously interpreted or applied the law;

"(5) the agency has engaged in an unlawful procedure or has failed to follow prescribed procedure;

"(6) the persons taking the agency action were improperly constituted as a decision-making body or subject to disqualification;

"(7) the agency action is based on a determination of fact, made or implied by the agency, that is not supported by evidence that is substantial when viewed in light of the record as a whole, which includes the agency record for judicial review, supplemented by any additional evidence received by the court under this act; or

"(8) the agency action is otherwise unreasonable, arbitrary or capricious."

The resolution of this appeal involves the interpretation of K.S.A. 79-201 *Ninth*. "Interpretation of a statute is a question of law, and this court's review is unlimited." *Hamilton v. State Farm Fire & Cas. Co.*, 263 Kan. 875, 879, 953 P.2d 1027 (1998). BOTA is a specialized agency that exists to decide taxation issues, and its decisions should be given great weight and deference when it is acting in its area of expertise. However, if we find that BOTA's interpretation is erroneous as a matter of law, we will take corrective steps. *In re Tax Appeal of Boeing Co.*, 261 Kan. 508, 515, 930 P.2d 1366 (1997).

As noted above, the fundamental rule of statutory interpretation is that the intent of the legislature, where it can be ascertained, governs the construction of the statute, and it is the function of the court to interpret a statute to give it the effect intended by the legislature. See *In re Tax Exemption Application of City of Wichita*, 255 Kan. at 842. The rule of strict construction is subservient to the fundamental rule of statutory construction which requires that the intent and purpose of the legislature govern. *In re Tax Appeal of Collingwood Grain, Inc.*, 257 Kan. at 246.

" 'In construing statutes, the legislative intention is to be determined from a general consideration of the entire act. Effect must be given, if possible, to the entire act and every part thereof. To this end, it is the duty of the court, as far as practicable, to reconcile the different provisions so as to make them consistent, harmonious, and sensible.' [Citation omitted.]" *KPERS v. Reimer & Koger Assocs., Inc.*, 262 Kan. 635, 643-44, 941 P.2d 1321 (1997).

When a statute is plain and unambiguous, a court must give effect to the intention of the legislature as expressed, rather than determine what the law should or should not be. *Martindale v. Tenny*, 250 Kan. 621, Syl. ¶ 2, 829 P.2d 561 (1992). However, where the face of the statute leaves its construction uncertain, the

court may properly look into the historical background of the enactment, the circumstances attending its passage, the purpose to be accomplished, and the effect the statute may have under various constructions suggested. *Bd. of Sedgwick County Comm'rs v. Action Rent to Own, Inc.*, 266 Kan. 293, Syl. ¶ 3, 969 P.2d 844 (1998); *Brown v. U.S.D. No. 333*, 261 Kan. 134, 142, 928 P.2d 57 (1966); *Director of Taxation v. Kansas Crude Oil Reclaiming Co.*, 236 Kan. 450, 458, 691 P.2d 1303 (1984).

The provisions of K.S.A. 79-201 set forth the property to be exempted from taxation in Kansas. K.S.A. 79-201 *Ninth*, a subsection of K.S.A 79-201 enacted in 1988, created a new exemption and has never been interpreted by this court. L. 1988, ch. 373, § 1. BOTA acknowledged it lacked guidance from the courts in its effort to define substantial and predominant use under the new amendment. The trial court found the provisions of K.S.A. 79-201 *Ninth* ambiguous as to whether the owner claiming the exemption must also be the one operating on the property to obtain the exemption. Because the face of K.S.A. 79-201 *Ninth* leaves its construction uncertain, we consider the historical background of all the provisions of K.S.A. 79-201, as well as the circumstances attending passage of the statute, the purpose to be accomplished by the amendment, and the effect the statute may have under the constructions employed by BOTA and the district court.

Historical Background

The Kansas Constitution, Art. 11, § 1(b) (1998 Supp.) provides:

"All property used exclusively for state, county, municipal, literary, educational, scientific religious, benevolent and charitable purposes, farm machinery and equipment, merchants' and manufacturers' inventories, other than public utility inventories included in subclass (3) of class 2, livestock, and all household goods and personal effects not used for the production of income, shall be exempted from property taxation."

Our constitution does not impose express limits on the legislative power to grant other tax exemptions. From the earliest days of the legislative assembly of the territory of Kansas, certain property was by statute declared exempt from property tax. See 1855 Laws of the Kansas Territory, ch. 137, § 2 (exempting such property as

churches, hospitals, and cemeteries provided.that the property is used for that purpose only).

Over the years, based upon our constitution and statutes exempting property *used exclusively* for the expressed statutory purpose, several well-recognized principles and rules of construction have evolved:

(1) Taxation is the rule; exemption is the exception. All doubts are to be resolved against exemption and in favor of taxation.

(2) Constitutional and statutory provisions exempting property from taxation are to be strictly construed. *Lutheran Home, Inc. v. Board of County Commissioners*, 211 Kan. 270, 275, 505 P.2d 1118 (1973); *In re Board of Johnson County Comm'rs*, 225 Kan. 517, 519, 592 P.2d 875 (1979).

(3) The burden of establishing exemption from taxation is.on the one claiming it. *Seventh Day Adventist v. Board of County Commissioners*, 211 Kan. 683, 690, 508 P.2d 911 (1973).

(4) The question is not whether or not the property is used partly or even largely for the purpose stated in the exemption provisions, but whether it is used exclusively for those proposes. *Clements v. Ljungdahl,* 161 Kan. 274, 167 P.2d 603 (1946); *In re Board of Johnson County Comm'rs,* 225 Kan. at 519.

(5) The phrase "used exclusively" in the constitution and statutes means that the use made of the property sought to be exempted from taxation must be only, solely, and purely for the.purposes stated, and without participation in any other use. *Seventh Day Adventist v. Board of County Commissioners*, 211 Kan. at 683.

It is important to note that prior to 1969, statutory property exemptions were based upon *ownership* and *use*. Kansas statutory law incorporated 14 real property tax exemptions, which fell into three categories: exemptions for certain residences, exemptions for property based upon ownership, and exemptions for property based upon use. See Comment, *Liberalizing Kansas Real Property Tax Exemptions: The 1988 Legislation*, 37 Kan. L. Rev. 597 (1989). Examples of exemption statutes based on use included exemptions for property used exclusively as places of public worship, public schoolhouses, graveyards, as well as property exclusively used for literary, educational, scientific, religious, benevolent, or charitable

purposes. Examples of exemptions based on ownership included property owned or leased by certain governmental, charitable, or benevolent organizations. See 37 Kan. L. Rev. at 598-600.

In 1968, the legislature formed a special joint committee known as the Hodge committee to perform a comprehensive study of property tax exemption statutes. The Hodge committee determined that "wherever possible exemptions should be on the basis of the State Constitution" and "taxation should be the rule and exemption should be the exception." Joint Committee on the State Tax Structure, Interim Report to the Kansas Legislature, Sen. J. 1969, pp. 104, 132-33; see 37 Kan. L. Rev. at 600. The Hodge committee recommended that exemptions not constitutionally based be repealed, including those exemptions based on property ownership. See Sen. J. 1969, pp. 132-35. An important factor in this recommendation was that many of the organizations whose specific statutory exemptions would be repealed based upon ownership testified that their organization would continue to qualify for exemption under the exclusive use requirements in the constitution. See Sen. J. 1969, pp. 128-29, 133-35.

The 1969 legislature adopted the Hodge committee's recommendations. Property tax exemptions for parsonages, residences of chaplains of hospitals operated by religious orders, property of endowment associations, property used to house faculty and students of denominational colleges, and lands used as shelterbelts, as well as exemptions for public libraries, property of not-for-profit hospital and medical insurance corporations, real estate owned or leased by veterans organizations, and property belonging to the YMCA, YWCA, Boy Scouts, Girl Scouts, and Campfire Girls were repealed. See L. 1969, ch. 429, § 1; 37 Kan. L. Rev. at 601.

In 1973, this court in *Lutheran Home, Inc. v. Board of County Commissioners,* 211 Kan. 270, 505 P.2d 1118 (1973), adopted a narrow definition of the meaning of "charitable" as used in the Kansas Constitution property tax exemption statutes. The decision had a profound effect on tax exemptions in this state. Highly summarized, the facts in that case established that Lutheran Home, Inc., was a Kansas not-for-profit corporation not affiliated or supported by any religious body. Its predecessor corporation operated

a nursing home made possible through the issuance of first mortgage bonds. When the corporation became insolvent, two private citizens, holders of about $45,000 in bonds, took over its operation and incorporated as a not-for-profit, nonstock corporation. The nursing home continued to operate and over a few years paid off the first mortgage bonds originally contracted for by the predecessor corporation. Residents of the nursing home were charged monthly rates for services which were paid either from their own or family funds or by welfare. Lutheran Home, Inc., charged the same as other nursing facilities in the county.

Lutheran Home, Inc's., articles of incorporation provided:

" 'It is the intent and purpose of this corporation and its Trustees that all services rendered and functions performed by the corporation except those rendered and performed for the United States or for any of its agencies, shall, at all times be handled on a cost of doing basis and without income or profit to the corporation or to its members as such, in order that any and all amounts received by the corporation from or in connection with, such services or functions, over and above the cost thereof to the corporation, shall at all times, belong to and be the exclusive property of the corporation.' " 211 Kan. at 273.

The question before this court was whether the nursing home was being used for charitable or benevolent purposes, qualifying it for property tax exemption. In defining "charitable and benevolent," this court stated:

"We have reconsidered all of the Kansas decisions along with cases from other jurisdictions. We have concluded that the concept of 'charity' as set forth in *Mason v. Zimmerman*, [81 Kan. 799, 106 Pac. 1005 (1910)], should be applied in this case and in future litigation in this state. In *Mason* we said that 'charity' is a gift to promote the welfare of others in need, and 'charitable,' as used in the constitutional and statutory provisions, means intended for charity. In this sense charity involves the doing of something generous for other human beings who are unable to provide for themselves. To have charity there must be a gift from one who has to one who has not. Unless there is a gift, there can be no charity." 211 Kan at 277.

We commented:

"We recognize that this construction of the word 'charity' is more restrictive than the liberal construction given the term in *Topeka Presbyterian Manor v. Board of County Commissioners*, [195 Kan. 90, 402 P.2d 802 (1965)], and *Evangelical Village & Bible Conference, Inc. v. Board of County Commrs.*, [207 Kan.

383, 485 P.2d 343 (1971)]. We believe, however, that such an interpretation is more fully in accord with the intent of the framers of the Kansas Constitution as expressed in article 11, section 1 and the intent of the legislature as set forth in K.S.A. 79-201. In view of the strict construction adopted here we, of necessity, overrule *Topeka Presbyterian Manor v. Board of County Commissioners, supra*; *Evangelical Village & Bible Conference, Inc. v. Board of County Comm'rs., supra*, and other decisions of this court contrary to our holding here." 211 Kan. at 278.

This court concluded that although it was possible that Lutheran Home, Inc., was altruistically motivated and served a socially constructive purpose, the fact that it was substantially compensated for its services brought it outside the narrow definition of charity which the court adopted and, thus, made it ineligible for tax exemption. 211 Kan. at 279.

The 1974 legislature responded to our decision in *Lutheran Home* by amending K.S.A. 79-201 to add exemptions for real property used exclusively for adult care homes operated by not-for-profit corporations, real property used exclusively by not-for-profit corporations for housing elderly persons having a limited or lower income, and real property used exclusively by other not-for-profit corporations for housing elderly persons, as well as exemptions for real property used exclusively by hospitals or psychiatric hospitals operated by not-for-profit corporations for hospital purposes, and for real property used exclusively for private children's homes operated by not-for-profit corporations. L. 1974, ch. 427, § 1. See 37 Kan. L. Rev. at 602. Between 1974 and 1985, the Kansas Legislature added a number of other exemptions. While these exemptions continued to require *exclusive use* of the property for the purpose specified, many of the exemptions also focused on the status of the owner or user of the property. 37 Kan. L. Rev. at 603-04.

In 1986, the legislature made a substantial move away from the requirement that "exclusive use" be the determining factor for tax exemption under K.S.A. 79-201. The legislature also rejected this court's narrow definition of "charitable and benevolent" in *Lutheran Home*. Under the 1986 amendments to K.S.A. 79-201, real property used exclusively for literary, educational, scientific, religious, benevolent, or charitable purposes continued to be tax exempt. The statute further provided:

"This exemption shall not be deemed inapplicable to property which would otherwise be exempt pursuant to this paragraph because an agency or organization: (a) Is reimbursed for the provision of services accomplishing the purposes enumerated in this paragraph based upon the ability to pay by the recipient of such services; or (b) is reimbursed for the actual expense of using such property for purposes enumerated in this paragraph; or (c) uses such property for a nonexempt purpose which is minimal in scope and insubstantial in nature if such use is incidental to the exempt purposes of this paragraph; or (d) charges a reasonable fee for admission to cultural or educational activities or permits the use of its property for such activities by a related agency or organizations, if any such activity is in furtherance of the purposes of this paragraph." L. 1986, ch. 369, § 1.

The 1986 amendments departed from this court's strict definition of "charitable and benevolent" in *Lutheran Home*, as well as expanded the exemption beyond what had been limited by the exclusive use test. At the same time, K.S.A. 79-201 *Second* continued to deny an exemption where the property was not actually used or occupied for the specific statutory purposes and where "such property [was] held or used as an investment even though the income or rentals received therefrom is used wholly for such literary, educational, scientific, religious, benevolent or charitable purposes." K.S.A. 79-201 *Second*.

In 1987, the YMCA sought a tax exemption for its property in Shawnee County under K.S.A. 79-201 *Second* on the grounds that the property was used exclusively for charitable, educational, scientific, religious, and benevolent purposes. See *In the Matter of the Application of Young Men's Christian Association for Exemption from Ad Valorem Taxation in Shawnee County, Kansas*, BOTA docket No. 6285-86-TX. BOTA found, however, that the YMCA, although providing valuable services to its members, did so in large part in exchange for fees paid by the members rather than for charitable purposes as contemplated in *Lutheran Home*. As a result, BOTA concluded that the YMCA's use of the property for charitable purposes was merely incidental to its use of the property for business purposes. Further, BOTA found that the YMCA owned some property for investment purposes, a use expressly prohibited by K.S.A. 79-201 *Second*. This BOTA decision and other decisions like it set the stage for passage of K.S.A. 79-201 *Ninth*, the provisions of which we interpret in this opinion.

Circumstances attending passage of K.S.A. 79-201 *Ninth.*

K.S.A. 79-201 *Ninth* was adopted largely in response to BOTA's decision in the YMCA case which required that property be used "exclusively" for charitable, educational, scientific, or religious purposes. See Testimony of James McBride, United Way of Greater Topeka, before the Senate Assessment & Taxation Committee, March 15, 1988; Testimony of Robert J. O'Connor before the Senate Assessment & Taxation Committee, March 16, 1988. K.S.A. 79-201 *Ninth* provides, under certain circumstances, an exemption for property actually and regularly used by a community service organization for the predominant purpose of providing humanitarian services.

The legislative history of K.S.A. 79-201 *Ninth* reflects several features that were included in the bill in response to BOTA's YMCA decision as well as other BOTA decisions and this court's decision in *Lutheran Home*. First, the bill expansively defined the term "humanitarian purposes" in contrast and in response to the very narrow interpretation of the term "charitable and benevolent purposes" in K.S.A. 79-201 *Second* adopted by this court in *Lutheran Home*. See Testimony of Robert J. O'Connor ("The first feature of House Bill 2651 is that it defines the 'humanitarian services' exemption category. This is necessary because of the narrow interpretation of *Lutheran Home* which the BOTA has recently been using.").

Second, K.S.A. 79-201 *Ninth* expressly failed to include the following language that had been included in K.S.A. 79-201 *Second*:

"This exemption shall not apply to such property, not actually used or occupied for the purposes set forth herein, *nor to such property held or used as an investment even though the income or rentals received therefrom is used wholly for such literary, educational, scientific, religious, benevolent or charitable purposes."* (Emphasis added.) K.S.A. 1986 Supp. 79-201 *Second*.

See Testimony of Robert J. O'Connor (K.S.A. 79-201 *Ninth* "eliminates the new definition and application of 'investment income' which the BOTA has recently created, and which it has used to deny traditional exemptions to most of those organizations which have lost their exemption in recent years.").

Finally, K.S.A. 79-201 *Ninth* abandoned the "exclusive use" requirement of earlier exemptions in favor of the provision that the property be used for the "predominant purpose" of providing humanitarian services in addition to allowing the incidental use of the property for a nonexempt purpose which is "minimal in scope and insubstantial in nature." K.S.A. 79-201 *Ninth* (e). See 37 Kan. L. Rev. at 605. However, the legislature, out of concern that such organizations might take advantage of the exemption to amass nontaxable properties, provided a number of conditions for exemption which will be discussed below. See K.S.A. 79-201 *Ninth* (a) through (g); Testimony of Robert J. O'Connor before the Senate Assessment & Taxation Committee, March 16, 1988.

The purpose to be accomplished.

K.S.A. 79-201 *Ninth* represents a major shift in policy by our legislature. The purpose of the legislature in adopting K.S.A. 79-201 *Ninth* was to expand but limit property exemption to "property actually and regularly used by a community service organization for the predominant purpose of providing humanitarian services." To that end, K.S.A. 79-201 *Ninth* contains several conditions designed to prevent potential abuse. Key factors that must be considered in determining whether exemption is granted are the predominant use as opposed to exclusive use of the property, the nature of the owner of the property as well as the use of the property, and whether the property is being used for the predominant purpose of providing humanitarian services as defined in the statute.

K.S.A. 79-201 *Ninth*.

BOTA and the district court analyzed the statutory requirements of K.S.A. 79-201 *Ninth* from the perspective of the WMPA, the owner-lessor of the property. We will do the same. However, under the particular facts of this case, we believe that it is also important to consider the conditions set forth in K.S.A. 79-201 *Ninth* from the perspective of the Center. Our ultimate resolution of whether the WMPA is entitled to an exemption depends upon whether the property as owned and operated is actually and regularly used by

a community service organization for the predominant purpose of providing humanitarian services. We, therefore, consider the totality of circumstances involved in the requested exemption, including the actual and regular use of the property claimed as exempt.

The threshold requirement—owned and operated by a not-for-profit corporation.

The exemption of K.S.A. 79-201 *Ninth* applies to:

"[a]ll real property and tangible personal property actually and regularly used by a community service organization for the predominant purpose of providing humanitarian services, *which is owned and operated by a corporation organized not for profit under the laws of the state of Kansas or by a corporation organized not for profit under the laws of another state and duly admitted to engage in business in this state as a foreign not-for-profit corporation if . . . .*" (Emphasis added.)

BOTA found that the WMPA was the "corporation" to which K.S.A. 79-201 *Ninth* refers and that the WMPA was the owner and operator of the medical clinic. It, therefore, analyzed the statutory provisions only with respect to the WMPA. However, this threshold requirement was a sticking point for the district court. It noted that while the clinic property was owned by the WMPA, it was operated by the Center. In analyzing the above statutory provisions the district court concluded: "The statute is ambiguous as to whether the 'owned and operated' requirement refers to the property or to the community services organization or both."

The district court concluded that in order to qualify for the exemption, the legislature intended that the owner corporation must also be the humanitarian service provider. The trial judge noted: "If unity of ownership and providing humanitarian services at the subject property was not intended by the legislature the disjunctive 'or' could have been placed between 'owned' and 'operated.' " We disagree.

The phrase "owned and operated" was added to K.S.A. 79-201 *Ninth* by amendment in 1989, replacing the term "operated." See L. 1989, ch. 288, § 1. At first glance, this would seem to reflect an intention by the legislature that the entity owning the property

must be the entity operating the property. However, research into the circumstances surrounding the 1989 amendment to K.S.A. 79-201 reveals that this is not the case.

Instead, the 1989 amendment was designed as part of a comprehensive attempt to prevent a situation wherein an entity that was not tax exempt would lease property to a tax exempt entity for a profit and thereby gain a tax benefit. See Minutes of the Senate Committee on Assessment and Taxation, March 30, 1989 and April 5, 1989. Thus, while the legislature's intent was to keep a nonexempt entity from gaining an exemption simply by leasing to an exempt entity, there is no expressed intent that the property be owned and operated by the same entity.

Moreover, the provisions of K.S.A. 79-201 *Second* exempting property actually and regularly used exclusively for literary, educational, scientific, religious, benevolent, or charitable purposes expressly prohibited tax exemption where "such property [was] held or used as an investment even though the income or rentals received therefrom is used wholly for such literary, educational, scientific, religious, benevolent or charitable purposes." The legislature did not include this prohibition in enacting K.S.A. 79-201 *Ninth,* which suggests that leasing under limited circumstances is permitted and unity of ownership is not a condition for exemption under K.S.A. 79-201 *Ninth.*

Use of the conjunctive "and" instead of "or" and use of "corporation" through the provisions of K.S.A. 79-201 *Ninth* does not in our opinion indicate an intent by the legislature to require that the entity owning the property must be the entity operating the property in order to qualify for exemption. What is required is that the property actually and regularly be used by a community service organization for the predominant purpose of providing humanitarian services and that it be owned and operated by a not-for-profit corporation. We conclude that the provisions of K.S.A. 79-201 *Ninth* do not require a unity of ownership to qualify for tax exemption.

There is no question in this case that both the WMPA and the Center are not-for-profit corporations organized under the laws of the state of Kansas. Nor is there any question that the property

claimed as exempt is "actually and regularly used by a community service organization." K.S.A. 79-201 *Ninth.*

While other states' interpretation of their exemption statutes are of limited value, we note that the recent trend in the United States is consistent with our decision that ownership and operation need not coincide in a single legal entity to qualify for tax exemption. See, *e.g., United Way v. Douglas Co. Bd. of Equal.*, 215 Neb. 1, 5-6, 337 N.W.2d 103 (1983); *Sisters of Charity, Etc. v. County of Bernalillo*, 93 N.M. 42, 45, 596 P.2d 255 (1979), and cases cited therein at 257.

K.S.A. 79-201 *Ninth* (a)—Do the directors of the corporation serve without pay for such services?

K.S.A. 79-201 *Ninth* (a) requires that the directors of the corporation seeking the exemption serve without pay for such services. This requirement was not addressed by the district court, but BOTA found that because some of the directors of the WMPA also saw patients at the Center and received payment from the WMPA for doing so, this requirement was not satisfied.

The plain language of K.S.A. 79-201 *Ninth* (a) requires that the directors serve without pay *for such services*. According to the express language, the directors of the corporation may not be compensated for their services *as directors*. The evidence before BOTA established that those physician members of the WMPA board who treated patients at the Center were compensated in an amount equal to 7½% of their state salary. There is not evidence that they were compensated for their services as directors. We conclude that under the plain language of the statute, both the WMPA and the Center satisfy the provisions of K.S.A. 79-201 *Ninth* (a).

K.S.A. 79-201 *Ninth* (b)—Is the corporation operated in a manner which does not result in the accrual of distributable profits, realization of private gain resulting from the payment of compensation in excess of a reasonable allowance for salary or other compensation for services rendered or the realization of any other form of private gain?

Neither BOTA nor the district court found a problem with the WMPA or the Center's compliance with subsection (b). The evidence establishes that both the WMPA and the Center operate in a manner which does not result in the accrual of distributable profits or the realization of private gain resulting from payment of compensation in excess of a reasonable allowance for salary. The WMPA and the Center satisfy K.S.A. 79-201 *Ninth* (b).

K.S.A. 79-201 Ninth (c)—Do any officers, directors, or members of such corporation have a pecuniary interest in the property for which exemption is claimed?

BOTA concluded that the directors of WMPA had a "pecuniary interest in the property for which the exemption is claimed." BOTA reasoned that some of the directors of the WMPA who are physicians work in the Center clinic and are compensated for their services by the WMPA. While they are not paid directly by the Center, the Center contracts with the WMPA for their services, and the Center, out of its budget, pays the WMPA, which in turn pays the physicians. Thus, according to BOTA, the directors of the WMPA, by receiving compensation indirectly through the Center, have a "pecuniary interest in the operation of the medical clinic."

K.S.A. 79-201 *Ninth* does not define the phrase "pecuniary interest in the property." BOTA mentions "a pecuniary interest in the medical clinic." However, the express provisions of K.S.A. 79-201 *Ninth* (c) provide "any pecuniary interest in the property for which exemption is claimed." The record is devoid of any evidence establishing that any officer, director, or member of either the WMPA or the Center had a pecuniary interest in the free standing clinic and parking area operated by the Center. We believe that this subsection is designed to prevent officers, directors, or members of the corporation claiming an exemption from individually profiting from the tax exempt status of property in which they have a pecuniary interest. While there may be an indirect way of violating the provisions of this subsection, reasonable compensation paid to the directors of the WMPA for services rendered to the Center in treating patients of the Center does not, in our opinion, constitute a pecuniary interest in the property.

It should be further noted that the amount of compensation paid by the WMPA to physicians in this case is minimal at best. For their services at the Center, each physician receives 7½% of his or her state salary. This compensation may in no way be considered unreasonable. We have in the past recognized that charitable institutions such as hospitals and clinics must for continued existence employ professional help and pay for the same. In *St. Francis Regional Med. Center, Inc. v. Weiss*, 254 Kan. 728, 869 P.2d 606 (1994), we dealt with the question of whether Kansas law prohibited a licensed hospital from contracting for a physician to render services to patients because the hospital itself could not render such medical services. After a circumspect review of existing authority, we concluded:

"[T]he legislature by statute and this court by decision have acknowledged what is and has been a reality for decades—hospitals employ physicians. Without physicians, nurses, and medical technicians, a hospital cannot achieve that for which it is created and licensed—to treat the sick and injured. To conclude that a hospital must do so without employing physicians is not only illogical but ignores reality." 254 Kan. at 745.

This court has also concluded in the distant past that the payment of ordinary and necessary operating expenses in not inconsistent with charitable purpose. In *Nuns of St. Dominic v. Younkin*, 118 Kan. 554, 235 Pac. 869 (1925), this court rejected the argument that nuns owning the hospital and securing room, board, and lodging as a result of revenues from "pay patients" rendered a hospital ineligible for exemption:

"If these incomes from pay patients and donations are used for the purpose of caring for or relieving the sick or disabled and increasing the facility of the institution for that purpose, and are not used for the purpose of declaring dividends or the financial profit (other than the paying of necessary operating expenses) of those connected with or having charge of the institution, such use is simply an extended use for charitable purposes." 118 Kan. at 559-60.

We conclude that the salaries paid by the WMPA to physicians staffing the Center do not create a pecuniary interest in the property claimed as exempt under K.S.A. 70-201 *Ninth*. While the directors of the WMPA who serve as physicians in the clinic may

have an interest in the continued operation of the Center, such an interest is not a pecuniary interest in the property itself.

K.S.A. 79-201 *Ninth* (d)—Is the corporation organized for the purpose of providing humanitarian services?

There is no dispute that the Center is organized for the purpose of providing humanitarian services. However, BOTA concluded that the WMPA did not satisfy this requirement, reasoning:

"With respect to requirement (d) of K.S.A. 1995 Supp. 79-201 *Ninth*, the Board is not convinced that the corporation is organized for the purpose of providing humanitarian services. It was elicited from Mr. Hanson that, in his opinion, one of the purposes of organizing medical practice associations was to supplement the salaries of physicians who teach at the Kansas University Medical School. Although this intent is not designated in the Articles of Incorporation for [the WMPA] as a purpose for which the corporation was formed, the payment from [the WMPA] to physicians who are faculty of the Kansas University Medical School for their time in the clinic cannot be ignored by the Board in its determination whether the subject property qualifies for an exemption."

The district court observed only that "the record is insufficient to establish that the [WMPA] qualifies as a humanitarian services provider under this statute."

K.S.A. 79-201 *Ninth* (d) requires that "the corporation is organized for the purpose of providing humanitarian services." K.S.A. 79-201 *Ninth* defines the term "humanitarian services" to mean

"the conduct of activities which substantially and predominantly meet a demonstrated community need and which improve the physical, mental, social, cultural or spiritual welfare of others or the relief, comfort or assistance of persons in distress or any combination thereof including but not limited to health and recreation services, child care, individual and family counseling, employment and training programs for handicapped persons and meals or feeding programs."

The evidence presented by the administrator did establish that one of the purposes at the time the WMPA was set up was to provide a salary for teaching physicians at the University. However, it is clear from its articles of incorporation that one of the WMPA missions is to instruct and train students. Without continued practice in the delivery of primary care by teachers at the medical school, it would be difficult if not impossible to accomplish this teaching mission.

The WMPA charter provides that its purpose is to

"engage in the continuous active conduct of medical education, medical research and medical care primarily in space located within the University of Kansas School of Medicine—Wichita in conjunction with and utilizing the facilities of such School of Medicine (including equipment, case studies, etc.) on a continuing basis. The principal purposes or functions of the corporation shall include the instruction and training of students, undergraduate, graduate and postgraduate, enrolled in the University of Kansas School of Medicine—Wichita Medical Practice Association pursuing a course of medical education offered by the University of Kansas, the conduct of investigations, research, experiments and studies to discover, develop or verify knowledge relating to the causes, diagnosis, treatment and the prevention or control of physical or mental diseases and impairments to man and the providing of medical care through its professional staff performing clinical services."

The purposes for which the WMPA is organized fall within the statutory definition of "humanitarian services." Its teaching mission as well as its purpose of "providing of medical care through its professional staff performing clinical services" could not be accomplished without the payment of a salary to physician-teachers who staff the WMPA and Center primary care clinics. K.S.A. 79-201 *Ninth* does not require that the purpose for which the corporation is founded be "exclusively" humanitarian. The mission of the WMPA, which we conclude is predominantly a humanitarian one, is limited by its articles of incorporation, the laws of the State of Kansas, and the Internal Revenue Code § 501(c)(3) to "charitable, educational or scientific purposes."

Both BOTA's finding and that of the district court are contrary to the evidence. We conclude that the uncontroverted evidence establishes that the WMPA is organized for the purpose of providing humanitarian service and thus satisfies the provisions of K.S.A. 79-201 *Ninth* (d).

K.S.A. 79-201 *Ninth* (e)—Is the actual use of the property substantially and predominantly related to the purpose of providing humanitarian services?

K.S.A. 79-201 *Ninth* requires that in order to qualify for exemption the property must be "actually and regularly used by a community service organization for the predominant purpose of pro-

viding humanitarian services." Subsection (e) reiterates this requirement as a condition for exemption and provides:

"(e) [T]he actual use of property for which an exemption is claimed must be substantially and predominantly related to the purpose of providing humanitarian services, except that, the use of such property for a nonexempt purpose which is minimal in scope and insubstantial in nature shall not result in the loss of exemption if such use is incidental to the purpose of providing humanitarian services by the corporation."

BOTA and the district court concluded that the WMPA did not meet the requirements even though the real property is "actually and regularly used [by the Center] for the predominant purpose of providing humanitarian services." BOTA and the district court determined that the WMPA use of the property included a non-exempt use of income from the lease which was not "minimal in scope and insubstantial in nature" as required by K.S.A. 79-201 *Ninth* (e).

BOTA and the district court rely on past decisions by this court wherein it was determined that the leasing of property produces income for the lessor and constitutes a simultaneous use which may result in denial of a request for tax exemption. In *Board of Wyandotte County Comm'rs v. Kansas Ave. Properties*, 246 Kan. 161, 168, 786 P.2d 1141 (1990) (citing *In re Board of Johnson County Comm'rs*, 225 Kan. 517, 592 P.2d 875 [1979]), this court noted:

" 'To say that an investor who owns valuable property, real or personal, and leases it for profit is not using his property ignores the obvious fact that the owner-lessor is exercising his right to use the property just as surely as if he were utilizing it in a physical sense for his own objectives. . . . The renting by the lessor and the physical use by the lessee constitute simultaneous uses of the property and when an owner leases his property to another, the lessee cannot be said to be the only one using the property. The owner is using it as he sees fit to reap a profit from his investment just as surely as if he physically operated the property.

"We hold that property owned by a non-tax-exempt entity and leased for profit to a qualifying tax-exempt entity, is not being used exclusively for tax-exempt proposes and is subject to ad valorem and property taxes.' 225 Kan. at 522-23."

We must observe that the above cases, including the cases cited by BOTA and the district court, were interpreting an exemption under K.S.A. 79-201 *Second*. The test under that statute, unlike K.S.A. 79-201 *Ninth*, is one of "exclusive use." It must also be

noted that in the above cases relied on by BOTA and the district court, unlike the case we deal with here, the lessor was a private individual, not a tax exempt not-for-profit corporation. See *Board of Wyandotte County Comm'rs v. Kansas Ave. Properties*, 246 Kan. at 162. Moreover, we observe that K.S.A. 79-201 *Second*, unlike K.S.A. 79-201 *Ninth*, specifically provides that no exemption would be allowed where such property is held or used as an investment even though "the income or rentals received therefrom is used wholly for such literary, educational, scientific, religious, benevolent or charitable purposes." K.S.A. 79-201 *Ninth*, on the other hand, specifically provides that the use of the property for a non-exempt purpose which is "minimal in scope and insubstantial in nature shall not result in the loss of exemption if such use is incidental to the purpose of providing humanitarian services by the corporation." We note that the threshold requirement of subsection (e) is that the actual use of property for which an exemption is claimed must be substantially and predominantly related to the purpose of providing humanitarian services. However, the observations made by the district court and BOTA are valid and must be resolved by this court.

The WMPA acquired the property for the express purpose of using it to house the clinic operated by a new, separate corporation, the Center. The rent in this case was set by the WMPA at below fair market value. The lease provides for a payment of $8.25 per square foot, while the evidence established fair market value to be $10-$12 per square foot. Twenty-two percent to 23% of the rental income earned is used by the WMPA for the operation and maintenance of the property. The remaining 78% goes into the budget of the WMPA. The only evidence of record is that this balance either goes into the WMPA reserves to be utilized as needed for sustaining the WMPA during periods of financial hardship where revenues collapse and expenses continue, or is used in furtherance of the humanitarian services that the WMPA provides.

This question, while difficult under the facts of this case, must be resolved in accord with the fundamental rule of statutory construction that the intent of the legislature, when it may be ascertained govern. We believe that the legislature intended by the

adoption of K.S.A. 79-201 *Ninth* that an exemption be granted under the particular facts of this case. The following observations support this interpretation:

First, we have concluded that both the WMPA and the Center are corporations organized for the purpose of providing humanitarian services. We also observe that the uncontroverted evidence establishes that both the WMPA and the Center, by reason of their not-for-profit incorporation under Kansas law and their express charter provisions, were not only organized for the purpose of providing humanitarian services as that term is defined in K.S.A. 79-201 *Ninth*, but are limited by such charter provision to providing "humanitarian services" as defined. Moreover, as noted below, both the WMPA and the Center are corporations exempt from federal income taxation under 501(c)(3) of the Internal Revenue Code, and contributions to each corporation are deductible under the Kansas Income Tax Act.

Second, no part of the income generated by the lease between the WMPA and the Center may inure to the benefit of any private shareholder or individual. And just as important, all of the property of each corporation, including the operating surplus from the lease, is devoted to predominantly humanitarian services as defined in K.S.A. 79-201 *Ninth*. While BOTA and the district court expressed concern that there was no detailed accounting of how the surplus rental was used, the uncontroverted evidence of record established that all property of the WMPA and the Center, including the surplus rental income, was "substantially and predominantly related to the purpose of providing humanitarian services." K.S.A. 79-201 *Ninth* (e).

Third, we believe it is important that the rent charged by the WMPA is below fair market value. While the surplus is large, setting the rent in the lease below fair market value signals an intent on the part of the WMPA that its predominant motive in the leasing arrangement was not profit. Other evidence of record establishes that from its very conception, the WMPA's purpose in establishing the Center was substantially and predominantly related to the purpose of providing humanitarian services to low income and medically underserved citizens of this state.

Fourth, the legislature, in enacting K.S.A. 79-201 *Ninth*, contemplated leasing arrangements by not incorporating provisions contained in the statute that previously prohibited exemption where "such property held or used as an investment even though the income or rentals received therefrom is used wholly for such literary, educational, scientific, religious, benevolent or charitable purposes." K.S.A. 79-201 *Second*. See Testimony of Robert J. O'Connor before the Senate Assessment & Taxation Committee, March 16, 1988. We conclude that the legislature intended for property owned by the entity seeking an exemption and leased to another entity to be eligible for exemption under certain circumstances. This conclusion is buttressed by a review of the YMCA case decided by BOTA in 1987, which was one of the principal decisions triggering the enactment of K.S.A. 79-201 *Ninth*. In that case, BOTA noted that many of the YMCA properties, and in particular the Camp Hammond facility, generated income from campers in excess of its operational expenses. *In the Matter of the Application of Young Men's Christian Association for Exemption from Ad Valorem Taxation in Shawnee County, Kansas*, BOTA docket No. 6285-86-TX, pp. 4, 12. From this fact, BOTA concluded that the property was an investment specifically prohibited by K.S.A. 79-201 *Second*. The enactment of K.S.A. 79-201 *Ninth* signals an intent on the part of the legislature to require a different result under the statute.

Finally, in denying the exemption under the provisions of K.S.A. 79-201 *Ninth* (e), BOTA and the district court relied upon a well-established principle of statutory construction that tax exemption statutes are to be strictly construed. We agree with this time-honored principle but note that this rule is subservient to the fundamental rule of statutory construction which requires that the intent and purpose of the legislature govern. *In re Tax Appeal of Collingwood Grain, Inc.*, 257 Kan. at 246.

K.S.A. 79-201 *Ninth* represents a major shift in policy by our legislature, providing for property exemption to property, as in this case, which is actually and regularly used by a community service organization for the predominant purpose of providing humanitarian service. As revealed by our historical analysis of this exemption,

we believe that the legislature's purpose was to encourage the use of property for humanitarian purposes. There is no question that the WMPA and the Center are organized for the purpose of providing humanitarian services. Nor is there any question that the actual use of the property from which an exemption is claimed is substantially and predominantly related to the purpose of providing humanitarian services. Under the particular facts of this case, we conclude that the below-market surplus rental income received by the WMPA is minimal in scope and insubstantial in nature and incidental to the purpose of providing humanitarian services by the WMPA and the Center.

K.S.A. 79-201 *Ninth* (f) and (g)—Is the corporation exempt from federal income taxation under 501(c)(3) of the Internal Revenue Code and are contributions to the corporation deductible under the Kansas Income Tax Act?

It is undisputed in this case that both the WMPA and the Center are exempt from federal income tax as 501(c)(3) corporations and contributions to both corporations are deductible under the Kansas Income Tax Act. As a result, the requirements of both K.S.A. 79-201 *Ninth* (f) and (g) are met.

Based upon the totality of circumstances in this case, we conclude that the property is exempt under the provisions of K.S.A. 79-201 *Ninth*. We hold that where the property for which exemption is claimed is owned and leased by a corporation fulfilling all requirements of K.S.A. 79-201 *Ninth* to another separate corporation that operates the property and also fulfills all statutory requirements of K.S.A. 79-201 *Ninth*, exemption is appropriate where it is established that (1) profit was not a dominant motive in the leasing arrangement, (2) any surplus revenue generated by the lease is "substantially and predominantly related to the purpose of providing humanitarian services" as defined by K.S.A. 79-201 *Ninth*, and (3) the property claimed as exempt is actually and regularly used by a community service organization for the predominant purpose of providing humanitarian services. We, therefore, reverse the district court decision affirming BOTA and reverse the BOTA order denying the exemption.

Reversed.

ABBOTT, J., not participating.

MARION CHIPMAN, Senior Judge, assigned.[1]

---

[1] **REPORTER'S NOTE:** Judge Chipman was appointed to hear case No. 79,672 vice Justice Abbott pursuant to the authority vested in the Supreme Court by K.S.A. 20-2616.