NOT DESIGNATED FOR PUBLICATION

No. 123,575

IN THE COURT OF APPEALS OF THE STATE OF KANSAS

IN THE MATTER OF THE APPLICATION OF KINGDOM CAMPGROUND & FAITH COMMUNITY CHAPEL FOR EXEMPTION FROM AD VALOREM TAXATION IN CHEROKEE COUNTY, KANSAS.

MEMORANDUM OPINION

Appeal from Kansas Board of Tax Appeals. Opinion filed July 22, 2022. Affirmed in part, reversed in part, and remanded with directions.

*Jarrod C. Kieffer*, of Stinson LLP, of Wichita, for appellant.

No brief filed by appellee.

Before CLINE, P.J., POWELL, AND ISHERWOOD JJ.

PER CURIAM: Kingdom Campground & Faith Community Chapel (Kingdom Campground) appeals from the Board of Tax Appeals' (BOTA) decision to deny its application for ad valorem tax exemption under K.S.A. 79-201 *Second* and *Ninth*. It claims BOTA erred in its determination that the campground failed to establish its rightful ownership of the property and that it used those buildings, exclusively, for a purpose which made it eligible for an exemption under the statute. Following a thorough review of the record, we conclude BOTA erred in its conclusions that Kingdom Campground did not own the property and that it misapplied the law as it relates to the building used as a parsonage. We further find that BOTA properly determined that the residential structures and remaining property do not qualify for a tax exemption. Thus, we affirm in part, reverse in part, and remand with directions to conduct an additional hearing to address the deficiencies noted in BOTA's conclusions regarding the parsonage.

1

FACTUAL AND PROCEDURAL BACKGROUND

The subject property is a religious campground comprised of 4 tax parcels that total slightly more than 12 acres of land in Galena, Kansas. Kingdom Campground owns 3 of the 4 tracts, Faith Community Chapel is the record owner of the remaining tract.

Kingdom Campground is over 100 years old and includes 18 buildings, as well as a cemetery. Numerous physical improvements were made to the property over time, with an eye toward preserving its simple atmosphere. In the eyes of the campground, a rustic environment ensured it remained true to its historical objective of offering a place of worship for those who practice the Pentecostal faith. At the inception of this litigation, Ben Pennock was the minister of Kingdom Campground, a position he had held for 10 years.

In 1960, BOTA issued an order finding Kingdom Campground exempt from taxation for that year and "for all subsequent years thereafter so long as it is owned by the applicant herein and used exclusively for religious purposes." In 1983, it issued another similar order and exempted the tabernacle, dormitories, dining hall, pumphouse, storage building and cemetery from taxation upon finding Kingdom Campground used them exclusively for religious purposes. That said, BOTA did not exempt the privately owned cabins or the retirement complex under construction at the time from taxation because it determined those facilities were not used exclusively for religious purposes.

Kingdom Campground's exemption status underwent an alteration in 2019, after Cherokee County Appraiser James Hixon reinspected the property and modified its classification. In December 2019, Pennock filed a tax exemption application with BOTA. A hearing was held in November the following year to address his request, at which time Pennock identified each of the buildings as they are commonly known to those who lived at Kingdom Campground:

*1. The House by the Road (Building 1)*

Pennock stated that "the single, sole purpose," of the building was to provide a dormitory, but services of various sorts were also occasionally conducted there in the past. A photograph admitted during the hearing showed a single bedroom inside the building.

*2. The White Building (Building 2)*

Kingdom Campground undertook construction of this building in 1983 with an eye toward using it as a retirement center but that plan never came to fruition. Rather, the bottom portion serves as a dormitory and the upper level, which remains unfinished, offers storage space for supplies required to maintain other buildings on the grounds.

*3. Sister Eleta Kaye Spencer's Cabin (Building 3)*

While this structure is frequently referenced by the inclusion of Ms. Spencer's name, evidence admitted at the hearing reflects that Ms. Spencer transferred her interest in the cabin back to Kingdom Campground around March 2000. Kingdom Campground is the recorded owner of the cabin and uses it as a dormitory.

*4. The Restaurant (Building 4)*

This building enables worshipers to acquire snacks or meals outside of the regularly scheduled offerings provided by the dining hall.

*5. The Tabernacle (Building 5)*

This is the worship hall where services are conducted and was stipulated as exempt.

*6. Dining Hall (Building 6)*

Kingdom Campground uses the main floor of this building for meals and fellowship while the upper level offers additional storage space. The building was stipulated as exempt.

*7. Kitchen/Nursery (Building 7)*

The main floor of this building is used as a nursery and provides the kitchen where daily primary meals are prepared. The upstairs is used for dormitories. This building was stipulated as exempt.

*8. Storage Building or Blue Building (Building 8)*

This building provides storage for large equipment, lumber, and other supplies used to maintain the grounds and buildings.

*9. Restrooms/Shower House (Building 9)*

This building is self-explanatory, it provides restroom and shower facilities.

*10. The Guesthouse (Building 10)*

This building is predominately used for storage although there is some indication it is also occasionally used as a dormitory.

*11. Sister Ellen Raley's Cabin (Building 11)*

Sister Ellen Raley occupies this cabin and serves as a volunteer head cook for Kingdom Campground. She has given her interest in the cabin back to the campground.

*12. Pennock's Cabin/Parsonage (Building 12)*

Pennock resides in this cabin.

*13. Roger Raley's/Melanie Smith's Cabin (Building 13)*

Roger Raley, a contractor and Oklahoma resident, invested a considerable amount of time designing and assisting with the construction of cabins at Kingdom Campground. At the time of the hearing, Raley's granddaughter, Melanie Smith, was the sole occupant of the cabin.

*14. Steven Short's Cabin (Building 14)*

Steven Short, one of Kingdom Campground's trustees, used this cabin on a part-time basis, whenever he was there doing work on the campgrounds.

*15. Rosanne's Cabin (Building 15)*

In 2012, Roseanne returned the cabin back to Kingdom Campground via an oral transfer. It now provides additional storage space for the camp.

*16. Creighton and Virginia's Cabin (Building 16)*

A caretaker previously occupied this building, but it was designated as Virginia Elliott's cabin at the time of the hearing.

*17. Memorial Chapel (Building 17)*

Kingdom Campground uses this building as a chapel and children's church. It was stipulated as exempt.

5

*18. Cemetery*

Kingdom Campground used this portion of its land as a cemetery. It was stipulated as exempt.

*19. Virgil and Melia Elliott's Cabin (Building 19)*

Virgil and Melia Elliott are the longtime occupants of this cabin. At the time of the hearing, however, they were no longer in good standing with the church and eviction proceedings had been initiated by Kingdom Campground.

During the hearing Pennock recognized that many of the buildings were used as dormitories. When asked to explain that rationale, Pennock analogized some of Kingdom Campground's religious services to the experience of attending a convention.

> "If you've ever been to any type of convention a lot of times you'll go there and you'll go to your convention meeting and these convention meetings will last from daylight till dark. Well, for example, church services start at seven a.m. Seven to nine. Then we eat breakfast, then we go . . . twelve to four. Then we eat dinner and then we have an evening service[] 7:30 on and it goes pretty late.

> "Well, it only makes sense to have buildings where you can stay right there because you are involved in the whole process. You're not getting close to the world, you're getting close to the Lord. Just like in my past life, I used to work in the auto industry and we would go—they would have me go—speak at these events and I would stay at the hotel, the convention center. They wanted me there eating breakfast with the people, breaking bread with them from daylight to dark because it was the process that you were experiencing."

After testifying about the different buildings on the property, Pennock opined that the use of the land and buildings remained the same as when BOTA issued its exemption orders in 1960 and 1983. Pennock then discussed documents entitled "Kingdom

6

Campground Cottage Agreement" which outline the rules by which occupants of cabins must abide. In 2019, Short, Virginia Elliott, Ellen Raley, Smith, and Pennock all signed such agreements.

Pennock explained these agreements imposed substantial burdens on the residents. For instance, a portion of the restrictions prohibited improvements to, or transfer of, the cabins without express written permission from Kingdom Campground and any such transfer could not be for profit. Sales, solicitations, tobacco, and alcohol products were likewise prohibited on the premises. Finally, only members of the Christian faith who were in good standing with Kingdom Campground's trustees enjoyed the privilege of occupancy. Pennock went on to share a series of statements and affidavits provided by various individuals either currently or historically involved with Kingdom Campground, and what they perceived to be the proper use of the buildings located on the property.

During cross-examination, Pennock asserted that the storage buildings were related to church activities. To the extent those structures simultaneously contained finished and unfinished portions, Pennock took the position that the finished rooms served active church functions and the unfinished portions offered storage for materials necessary to the campground's function. He disavowed the County's suggestion that the entirety of some buildings or unfinished portions of others were not usable and explained that segments of those buildings were in various states of improvement or repair. According to Pennock, Kingdom Campground annually hosts sessions, typically 1-2 weeks in duration, at which time volunteers work to renovate the buildings.

When asked about the use of the cabins, Pennock reiterated that their use remains as it was in 1983. In response, the County highlighted the fact those buildings did not receive tax exemption in 1983. Pennock disagreed that the cabins were predominantly used for personal interests and explained that while the occupants of the cabins pay utilities, they do not receive mail directly to the cabin or have individual sidewalks and

7

driveways as one might find with a private residence. Further, residents may only entertain guests in their cabins who adhere to the teachings of the faith. He maintained that the cabins primarily serve a religious function but acknowledged that religious services are not held inside the cabins.

The County inquired about the ownership of Building 12, the parsonage which Pennock occupied. He explained that he acquired it from Donald Spencer in 2005 and while the terms of the transfer did not expressly identify any of the conditions outlined in the more recent cottage agreements, those same restrictions nevertheless accompanied the structure. He further stated that he executed a land lease agreement with Kingdom Campground in 2006, which granted him permission to use Building 12 and have his personal property located inside. Pennock informed BOTA that he paid taxes on the cabin for the past 15 years, despite the fact he lived in Oklahoma full-time until approximately 2015. According to Pennock, the cabin had only been his full-time personal residence for a little more than four years. Then, in 2017, Pennock executed a document entitled Bill of Sale, between himself and Stone Tabernacle Church for Building 12. When asked to describe Stone Tabernacle Church, Pennock explained he served as minister there and it was one of the churches that supports Kingdom Campground. That said, he claimed to be subject to the same conditions governing the other cottage agreements and that he considered Building 12 to be a parsonage that should be tax exempt.

Short, who served as one of the trustees of Kingdom Campground, also testified at the hearing and explained that while Building 14 was in his name, he lived in Oklahoma full-time, so he only used the building when he visited the campground. Short, like others, also executed a cottage agreement and said he understood the rules contained therein. But, in his opinion, execution of a written agreement to outline the rules seemed largely unnecessary because those were already known to church members and passed from mouth to ear. Even so, in his opinion, his interest in the cabin simply meant that he

8

"reserve[d] the right to use that cabin as long as it's not needed for someone else," and he was aware that other individuals made use of the cabin in his absence.

Short joined Pennock's assertion that the cabins served a necessary religious use because they housed members of the church and people who volunteered at Kingdom Campground during work weeks. He testified that the cabins provided a convenient alternative to the need to find another place to stay, such as a motel. Additionally, the cabins enabled people to eat and attend services multiple times per day during the work weeks. Finally, Short offered that spending more time on the property aligned with his faith and its teachings that the purpose of the campground was to detach from the outside world and focus on deepening one's relationship with God.

During cross-examination, Short explained that he first obtained an interest in the cabin by reimbursing the previous owner for work they performed on the structure, and he retained that interest in the cabin for more than 20 years. During that time, he paid the utility bills for the cabin and consistently kept some of his personal belongings inside. Finally, he only ever hosted other members of the church as guests in the cabin.

Hixon, the Cherokee County Appraiser, testified after Short. He informed the Board that his career in the appraisal business spanned 38 years and his involvement with Kingdom Campground arose out of his duties to reinspect properties every six years. According to Hixon, his inspection of the campground revealed a property that appeared "very rundown, a lot of deferred maintenance and hadn't been used. Many of the buildings were in very bad condition." Hixon understood that the use of the property helped guide the tax exemption analysis, and he believed Kingdom Campground no longer used most of the property at issue for an exempt purpose. As a result, he changed the property's tax classification in 2019 to make it taxable going forward.

Hixon further testified that he later revisited Kingdom Campground after his initial inspection and noticed that some of the buildings appeared cleaner or bore indicia of other alterations. This second visit led Hixon to believe that a portion of the buildings were legitimately used for religious purposes. However, he continued to adhere to his initial conclusion that some of the cabins and other buildings remained largely unusable.

According to Hixon, Kingdom Campground refused to allow him to enter and view the interior of the properties. Pennock disagreed with this contention and highlighted a lengthy email exchange during which he tried multiple times to arrange a time with Hixon when they could tour Kingdom Campground together. Even without viewing the inside of the buildings, Hixon concluded they were unusable because "in the appraisal profession, there's . . . the principle of conformity which basically says . . . whatever the outside looks like probably the inside looks the same."

BOTA issued its order in November 2020. It included the stipulation of the parties, which exempted the "tabernacle, dining/fellowship hall, chapel, and kitchen/office/nursery" from taxation, as well as the "one acre on which the chapel and cemetery sit and two acres on which the remaining buildings sit." But BOTA concluded the residential dwellings, parsonage, and the remaining real estate did not qualify for exemption. Kingdom Campground subsequently filed a petition for reconsideration which was denied.

Kingdom Campground now brings the matter before us to resolve whether BOTA's conclusion was legally sound.

ANALYSIS

*Standards of Review*

Under K.S.A. 74-2426(c)(4)(A), any aggrieved person has the right to appeal an order from BOTA by filing a petition with this court. Here, Kingdom Campground filed a petition for judicial review. This court reviews BOTA's decision in the manner prescribed by the Kansas Judicial Review Act (KJRA), K.S.A. 77-601 et seq., because BOTA orders are subject to KJRA review. K.S.A. 74-2426(c).

Whether certain property is exempt from ad valorem taxation is a question of law if the facts are not in dispute, but it is a mixed question of law and fact if the facts are controverted. *In re Mental Health Ass'n of Heartland*, 289 Kan. 1209, 1211, 221 P.3d 580 (2009). We may reverse BOTA's decision if "the agency has erroneously interpreted or applied the law." K.S.A. 77-621(c)(4). Because the issue presented in this appeal concerns the application and interpretation of K.S.A. 79-201, a question of law, this court has unlimited review and owes no deference to BOTA's statutory interpretation. See *May v. Cline*, 304 Kan. 671, 675, 372 P.3d 1242 (2016); *Douglas v. Ad Astra Information Systems*, 296 Kan. 552, 559, 293 P.3d 723 (2013); *In re Tax Exemption Application of Kouri Place*, 44 Kan.App.2d 467, 471-72, 239 P.3d 96 (2010) (applying ruling to BOTA decisions).

Constitutional and statutory provisions exempting property from taxation are to be strictly construed and the burden of establishing exemption from taxation is upon the one claiming it. *Topeka Cemetery Ass'n v. Schnellbacher*, 218 Kan. 39, 42, 542 P.2d 278 (1975). Strict construction of an exemption provision does not, however, warrant unreasonable construction. *In re Tax Application of Lietz Constr. Co.*, 273 Kan. 890, Syl. ¶ 7, 47 P.3d 1275 (2002). Taxation is the rule; exemption is the exception. All doubts are

to be resolved against exemption and in favor of taxation. *In re Tax Appeal of Univ. of Kansas School of Medicine*, 266 Kan. 737, 751, 973 P.2d 176 (1999).

Eight standards under which an appellate court shall grant relief are set forth in K.SA. 77-621(c). Kingdom Campground relies on K.S.A. 77-621(c)(3), (c)(4), (c)(7), and (c)(8) as foundation for their claim that they are entitled to relief. Under K.S.A. 77-621(c)(3), this court shall grant relief if it determines BOTA "has not decided an issue requiring resolution." Under K.S.A. 77-621(c)(4), relief is warranted if we determine BOTA "erroneously interpreted or applied the law."

K.S.A. 77-621(c)(7) directs reviewing courts to grant relief when BOTA's "action is based on a determination of fact, made or implied by the agency, that is not supported to the appropriate standard of proof by evidence that is substantial when viewed in light of the record as a whole." The statute goes on to define "'in light of the record as a whole'" to include the evidence both supporting and detracting from an agency's finding. K.S.A. 77-621(d). Substantial competent evidence is that which "'possesses both relevance and substance and provides a substantial basis of fact from which the issues can be reasonably determined.' [Citation omitted.]" *In re Equalization Appeal of Wagner*, 304 Kan. 587, 599, 372 P.3d 1226 (2016). When reviewing the record, this court does not reweigh the evidence or engage in de novo review. K.S.A. 77-621(d).

Finally, under K.S.A. 77-621(c)(8), relief should be granted in those instances where we conclude that BOTA's "action is otherwise unreasonable, arbitrary or capricious." The test for arbitrary and capricious conduct under that subsection of the statute "relates to whether a particular action should have been taken or is justified, such as the reasonableness of an agency's exercise of discretion in reaching the determination, or whether the agency's action is without foundation in fact." *Lario Oil & Gas Co. v. Kansas Corporation Comm'n*, 57 Kan. App. 2d 184, 205, 450 P.3d 353 (2019) (citing *Kansas Dept. of Revenue v. Powell*, 290 Kan. 564, 569, 232 P.3d 856 [2010]). Kingdom

12

Campground, as the party challenging BOTA's action, has the burden to prove arbitrary and capricious conduct. See *In re Equalization Appeal of Tallgrass Prairie Holdings, LLC*, 50 Kan. App. 2d 635, 643, 333 P.3d 899 (2014).

K.S.A. 77-526(c) mandates that a final order "shall include, separately stated, findings of fact, conclusions of law and policy reasons for the decision if it is an exercise of the state agency's discretion."

> "An administrative agency must assume the responsibility of expressing the basic facts on which it relies with sufficient specificity to convey to the parties, as well as to the court, an adequate statement of the facts which persuaded the agency to arrive at its decision. Thus, there must be findings on all applicable standards which govern the agency's determination, and the findings must be expressed in language sufficiently definite and certain to constitute a valid basis for the order, otherwise the order cannot stand. Findings of ultimate fact expressed in the language of the applicable statute are not enough in the absence of basic findings to support them. [Citations omitted.]" *Blue Cross & Blue Shield v. Bell*, 227 Kan. 426, 433-34, 607 P.2d 498 (1980); see also *In re Matter of Lowe's Home Centers, LLC*, No. 115,254, 2017 WL 1369944, at *16 (Kan. App. 2017) (unpublished opinion) (applying the rule to a BOTA order).

As stated above, BOTA's original order and its order denying reconsideration separated Kingdom Campground into four different components: (1) the stipulated portions of the property; (2) the residential dwellings; (3) the parsonage; and (4) the remaining real estate. The stipulated portions of Kingdom Campground are not in dispute and will not be discussed. The remaining three components will be discussed in turn.

DID BOTA ERR IN DENYING EXEMPTION FOR THE RESIDENTIAL DWELLINGS?

BOTA considered Buildings 11, 12, 13, 14, 15, 16, and 19 to be residential dwellings. Building 12 is the parsonage and will be addressed independently later in our analysis. Those that remain are as follows:

13

Building 11—Sister Ellen Raley's Cabin

Building 13—Roger Raley's /Melanie Smith's Cabin

Building 14—Steven Short's Cabin

Building 15—Sister Rosanne's Cabin

Building 16—Creighton and Virginia's Cabin

Building 19—Virgil and Melia Elliot's Cabin.

Kingdom Campground asserts that reversal of BOTA's conclusion is warranted because each of the listed buildings properly qualify for tax exemption pursuant to K.S.A. 79-201 *Second*. That statute states, in relevant part:

> "The following described property, to the extent herein specified, shall be and is hereby exempt from all property or ad valorem taxes levied under the laws of the State of Kansas:
>
> . . . .
>
> "*Second.* All real property, and all tangible personal property, actually and regularly used exclusively for . . . religious . . . purposes . . . . This exemption shall not be deemed inapplicable to property which would otherwise be exempt pursuant to this paragraph because an agency or organization: . . . (c) uses such property for a nonexempt purpose which is minimal in scope and insubstantial in nature if such use is incidental to the exempt purposes of this paragraph . . . ."

A two-fold rationale undergirded BOTA's denial of an exemption for these buildings. First, it concluded that Kingdom Campground did not qualify for exemption because it failed to satisfy its burden to prove its rightful ownership of the structures. Rather, according to BOTA, the evidence, which it determined included questionable bills of sale and conflicting testimony, reflected that ownership was seemingly amorphous. That is, it found one possible interpretation to be that members may legitimately own the properties but remain subject to a bevy of contingencies which were only occasionally memorialized in writing. Under a second theory, individual members "purchased" the cabins, but Kingdom Campground retained ownership rights to all the

14

dwellings, leaving the member with merely a limited right to its usage that was inferior to whatever need the campground determined it had for the building. Thus, it was unclear who in fact owned the dwellings.

BOTA next denied the campground's exemption application on the grounds it failed to prove it used the buildings exclusively for religious purposes as required by K.S.A. 79-201 *First* and *Second*. Rather, the properties principally fulfilled a residential need and mere occupancy by a church member did not satisfy the religious requirement. BOTA acknowledged the exception which allows for nonexempt insubstantial use of the buildings without then stripping the property of its exemption eligibility, provided religious use remained the focal point. However, in BOTA's opinion, that predominant spiritual purpose was lacking, and at best, the properties enjoyed a simultaneous use.

We will address both components of BOTA's exemption denial in turn.

*Ownership of the Dwellings*

In finding that Kingdom Campground failed to sustain its burden on this issue, BOTA relied on K.S.A. 79-213(a), which provides:  "Any property owner requesting an exemption from the payment of ad valorem property taxes assessed, or to be assessed, against their property shall be required to file an initial request for exemption, on forms approved by the state board of tax appeals and provided by the county appraiser."

We begin our analysis by addressing Kingdom Campground's assertion that BOTA essentially placed undue emphasis on clarifying the issue of ownership because that factor is irrelevant to the exemption inquiry. They did not offer an analysis of the authority that provides support for their conclusion. Nevertheless, we disagree with their contention.

15

Given that this claim arises out of the operation of K.S.A. 79-201 *Second*, a provision contained within the Taxation Act, any analysis of the issue must begin with the words used in those sections. That language offers the most important key to the legislature's intention in executing the Act's passage. See *Nauheim v. City of Topeka*, 309 Kan. 145, 149, 432 P.3d 647 (2019). The most fundamental rule of statutory construction is that the intent of the legislature governs if that intent can be ascertained. *Bergstrom v. Spears Manufacturing Co.*, 289 Kan. 605, 607, 214 P.3d 676 (2009). Then, finally, when construing statutes to determine legislative intent, appellate courts must consider various provisions of an act in pari materia with a view of reconciling and bringing the provisions into workable harmony if possible. *Redd v. Kansas Truck Center*, 291 Kan. 176, 195, 239 P.3d 66 (2010).

Our navigation of the Act begins with the most fundamental of its sections, the "Words and Phrases" outlined under K.S.A. 79-102. This provision clarifies that "the term 'property,' when used alone in this act, shall mean and include every kind of property subject to ownership." K.S.A. 79-102. Next, we draw guidance from K.S.A. 79-210 which mandates:

"The owner or owners of all property which is exempt from the payment of property taxes under the laws of the state of Kansas for a specified period of years, other than property exempt under K.S.A. 79-201d and 79-201g, and amendments thereto, shall in each year after approval thereof by the state board of tax appeals claim such exemption on or before March 1 of each year in which such exemption is claimed in the manner hereinafter provided."

As we noted previously, K.S.A. 79-213 speaks directly to the exemption request procedure. K.S.A. 79-214 addresses the procedure to be undertaken when property is no longer used for an exempt purpose and places the onus upon the "owner" of the property to notify the county appraiser in the county where such property is located "[w]ithin 30

16

days after any property exempted from property taxation ceases to be used exclusively for an exempt purpose."

Finally, application of K.S.A. 79-201 *Fifth*, *Seventh*, *Ninth*, and *Tenth* are also contingent upon the existence of ownership.

The concept that ownership is a deserving of consideration in the exemption inquiry also finds its support in caselaw as evidenced by *In re Tax Appeal of Univ. of Kansas School of Medicine*, 266 Kan. 737. In that case, a nonprofit owner-lessor of property used by a nonprofit lessee to provide medical services for low income, medically underserved populations applied for a property tax exemption pursuant to K.S.A. 79-201 *Ninth*. BOTA denied the application upon finding that the property claimed as exempt was not exclusively used by the owner-lessor for an expressed constitutional or statutory purpose. Our Supreme Court reversed BOTA's decision. In so doing, it determined that whether the property at issue was owned and operated by a not-for-profit corporation is a "threshold requirement." 266 Kan. at 758. The Court observed that K.S.A. 79-201 *Ninth* was amended in 1999 to insert "owned" as part of a comprehensive attempt to prevent a situation where an entity that was not tax exempt would lease property to a tax-exempt entity for a profit and thereby gain a tax benefit. 266 Kan. at 758-59. See also *Topeka Cemetery Ass'n v. Schnellbacher*, 218 Kan. at 42-43 (The determination of whether a tax exemption is appropriate involves a combined consideration of ownership and use.).

While we acknowledge that evolution of the law in this area reflects a minimization of ownership in the overall calculus, we decline to find it lacks any significance or should otherwise be eliminated in its entirety. See *In re Tax Appeal of Univ. of Kansas School of Medicine*, 266 Kan. at 751-52. Thus, we are not persuaded by Kingdom Campground's conclusory assertion that ownership lacks any import beyond ensuring whether the proper filing requirements are fulfilled.

17

Kingdom Campground next contends that BOTA's conclusion that the campground does not own the residential dwellings directly contravenes the evidence adduced during the hearing, which it asserts undeniably reflected that "it is *the* owner" of the property. It acknowledges that transfer documents exist for cabins 14 and 15 but posits that as reflected by the precise terms employed therein, Kingdom Campground never intended to transfer anything greater than a very narrow occupancy interest with strict, faith-based usage limitations imposed by the campground. As to the remaining dwellings, it asserts there is no evidence to support the conclusion that those cabins are owned by anyone other than Kingdom Campground.

During the BOTA hearing, the County admitted exhibits containing the property record cards for buildings inventoried on Kingdom Campground. Those cards indicated that Kingdom Campground owned the property at issue.

BOTA concluded that, at first blush, based upon the documentation admitted at the hearing, the church member-purchaser appeared to be the rightful owner given the occupancy they enjoyed mirrored that associated with a private residence. That is, the occupant is responsible for utility payments, received mail at the campground, entertained guests, and possessed the freedom to outfit the cabin with their personal property. Thus, from BOTA's perspective, Kingdom Campground failed to bring forth sufficient evidence to establish sole ownership of the cabins.

When we delve deeper into those transactions, however, it reveals that the residency privilege BOTA deemed so compelling was contingent upon a considerable number of significant restrictions that are often not recorded and the enforcement of which is not clearly stated. For example, to be a candidate for residency one must be a member of the faith in good standing with Kingdom Campground's Trustees and pledge to adhere to certain social restrictions during their occupancy that align with the teachings of the church. We recognize this may have contributed to the conclusion that Kingdom

18

Campground simply maintained a shared ownership interest in those structures. However, when that evidence is viewed in conjunction with the testimony elicited at the hearing which indicated that the occupant possessed a usage interest in the cabin that was secondary to the needs of Kingdom Campground, in our opinion it nudges the needle toward the campground. Finally, and perhaps most notably, is the restrictive provision to which each occupant agreed that unequivocally stated, "[a]ny cottage or any structure can be ordered demolished at any time by the board of trustees *without notice*." (Emphasis added).

In the context of real property, "sale" is defined as "the *transfer of ownership* of and title to property from one person to another for a price." *Am. Agcredit, PCA v. Estate of Blazek*, No. 110,956, 2015 WL 326584, *6 (Kan. App. 2015) (unpublished opinion). Kansas caselaw recognizes that a party must pass title in order to sell real property. See *Smith v. Harris*, 181 Kan. 237, 252-54, 311 P.2d 325 (1957); *In re Application of SBA for Tax Exemption Ad Valorem*, 14 Kan. App. 2d 600, 606, 797 P.2d 879 (1990) ("'Since the deed is the instrument which passes title, . . . there is no complete sale of the property until the deed is in fact issued.'") (quoting *McFall v. Ford*, 133 Kan. 593, 618, 1 P.2d 273 [1931]). There is nothing in the record before us to support the conclusion that legal ownership of the cabins was ever transferred to or held by members of the church.

K.S.A. 77-621(c)(7) mandates that actions undertaken by BOTA be supported by substantial competent evidence. Its conclusion that ownership of the dwellings is truly mired in an interminable gray area fails to clear that hurdle. Rather, a comprehensive review of the aforementioned evidence reveals Kingdom Campground is the rightful owner. Thus, we find that BOTA missed the mark when it concluded Kingdom Campground "did not provide adequate evidence of who in fact owns the dwellings."

*Use of the Dwellings*

As stated above, BOTA concluded these buildings did not qualify for tax exemption because they run afoul of the clear language of K.S.A. 79-201 *Second*. In support of its ruling, BOTA explained that Kingdom Campground's application must be denied because it failed to establish that it conducted religious activities within these structures. Rather, the evidence reflected that it used the properties as private residential dwellings for its members and temporary lodging for guests at the campground. BOTA acknowledged that if Kingdom Campground sustained its burden to demonstrate "some religious use were taking place" then "'nonexempt insubstantial use'" is permitted. As it was, however, BOTA concluded "the private residential use is more than merely insubstantial."

Kingdom Campground asserts reversal of BOTA's conclusion is warranted because its conclusion that these structures fall outside the parameters of the exemption set forth under K.S.A. 79-201 *Second* is flawed. We are not persuaded and, for the following reasons, leave BOTA's order intact.

In describing property exempt from taxation, K.S.A. 79-201 *Second* states, in part:

"All real property, and all tangible personal property, actually and regularly used exclusively for literary, educational, scientific, religious, benevolent or charitable purposes, including property used exclusively for such purposes by more than one agency or organization for one or more of such exempt purposes. Except with regard to real property which is owned by a religious organization, is to be used exclusively for religious purposes and is not used for a nonexempt purpose prior to its exclusive use for religious purposes which property shall be deemed to be actually and regularly used exclusively for religious purposes for the purposes of this paragraph, this exemption shall not apply to such property, not actually used or occupied for the purposes set forth herein, nor to such property held or used as an investment even though the income or rentals received therefrom is used wholly for such literary, educational, scientific, religious,

20

benevolent or charitable purposes. . . . This exemption shall not be deemed inapplicable to property which would otherwise be exempt pursuant to this paragraph because an agency or organization: . . . (c) uses such property for a nonexempt purpose which is minimal in scope and insubstantial in nature if such use is incidental to the exempt purposes of this paragraph . . . ." K.S.A. 79-201 *Second.*

The conclusions in both of BOTA's orders focused on the "exclusive use" portion of the statute. It found that because these cabins served a largely residential function their purpose failed to meet the exclusive religious use requirement of the provision. Kingdom Campground contends this conclusion is erroneous for two reasons: (1) not all the buildings in this category are used as personal residences; and (2) BOTA failed to analyze whether the use of the buildings by their regular residents is minimal in scope and insubstantial in nature.

To recap, BOTA designated buildings 11, 12, 13, 14, 15, 16, and 19 as residential dwellings. Pennock stated that Building 11 is occupied by Sister Ellen Raley, the volunteer head cook. Again, Pennock lived in Building 12 and that structure will be analyzed independently in a later issue. Melanie Smith occupied Building 13 at the time of the hearing and Building 14 is Steven Short's cabin. Short testified that he used the cabin as a residence whenever he visited from Oklahoma and other individuals used it for that purpose in his absence. He also recalled times when he was at Kingdom Campground, but the church gave others priority to the cabin. Building 15 is known as Rosanne's cabin even though she transferred it back to Kingdom Campground in 2012. Pennock undertook renovation measures to convert it to an office but halted his efforts until the exemption issue got resolved. According to Pennock, he did not want to invest additional funds in the building because Kingdom Campground intended to demolish it if BOTA ultimately deemed it non-exempt. The residential cabin labeled Building 16 was commonly known as Virginia Elliot's cabin, but Pennock did not expound upon its occupancy status at the time of the hearing. In Kingdom Campground's petition for reconsideration, it claimed that Building 16 "is not livable" and "has been gutted to the

21

studs." Finally, despite being embroiled in eviction proceedings with Kingdom Campground, Virgil and Melia Elliott continued to live in the cabin labeled Building 19.

Thus, we conclude, without reservation, that Buildings 11, 13, 14, and 19 are used as full-time residential dwellings. No evidence was presented to demonstrate they are subject to other uses, specifically any of a religious nature. It is unclear what use, if any, Building 15 currently enjoys given the fact Pennock abruptly halted its evolution from a residential cabin to an office. Building 16 appears stripped of its residential status to join the growing list of storage buildings at the campground.

To define "exclusive use," BOTA relied on the definition stated in *T-Bone Feeders, Inc. v. Martin*, 236 Kan. 641, 646, 693 P.2d 1187 (1985), *superseded by statute* as stated in *In re Tax Application of Lietz Constr. Co.*, 273 Kan. 890, 901-03, 47 P.3d 1275 (2002). There, our Supreme Court stated that "[t]he phrase 'used exclusively' in the constitution and statutes means that the use made of the property sought to be exempted from taxation must be only, solely, and purely for the purposes stated, and without participation in any other use." 236 Kan. at 646 (citing *Seventh Day Adventist Kansas Conference Ass'n. v. Board of County Commissioners*, 211 Kan. 683, 690, 508 P.2d 911 [1973]).

But Kingdom Campground urges this court to rely on *Midwest Presbytery v. Jefferson County Appraiser*, 17 Kan. App. 2d 676, 843 P.2d 277 (1992). It contends that case offers more persuasive authority under the facts before us because it "directly interprets the impact of the 1986 amendments on the 'used exclusively' requirement of K.S.A. 79-201 *Second* in the context of a church campground."

In that case, Midwest Presbytery owned and used a 30-acre tract of land for a church camp. The property always received tax exemption status even as Midwest Presbytery made several improvements over the years. In 1989, Midwest Presbytery built

22

a residence for a caretaker because it believed that, in light of recent incidents of vandalism, a caretaker could maintain the property and provide security for the camp. The caretaker's residence included a small workshop, a storm shelter, and a storage area. Midwest Presbytery later filed an application seeking tax exemption for that residence, but BOTA denied the exemption upon concluding the residence failed to satisfy the requirements of K.S.A. 79-201 *Second*. Midwest Presbytery appealed to the district court, which affirmed BOTA's decision and concluded as a matter of law that Midwest Presbytery did not use the caretaker's residence exclusively for religious purposes. 17 Kan. App. 2d at 676-77.

Midwest Presbytery pursued an appeal to this court and argued that "the [L]egislature's amendments to 79-201 *Second* broadened the definition of 'exclusive use.'" 17 Kan. App. 2d at 677. This court agreed and explained that the amendments were a legislative response to a previous decision in which this court found that a religious camp lost tax-exempt status when it charged a nominal fee and allowed nonreligious groups to use the camp facilities. It also explained the broadened definition allowed for nonexempt purposes which are minimal in scope and incidental to the exempt purposes. 17 Kan. App. 2d at 677-78.

Kingdom Campground argues that based on our ruling in *Midwest Presbytery*, the incidental uses the structures under scrutiny are subject to should not destroy their exempt status.

Kingdom Campground's primary purpose is to offer a place of worship and faith-based enrichment for its members. But BOTA properly concluded its use of the cabins fails to satisfy the exclusive use requirement of K.S.A. 79-201 *Second*.

When property is sought to be exempted from taxation it must be clearly demonstrated that the property at issue enjoys usage solely and purely for the purposes

23

stated, free from any other use. See *Woman's Club of Topeka v. Shawnee Cnty.*, 253 Kan. 175, 186, 853 P.2d 1157 (1993). Kingdom Campground properly observes that, in *Midwest Presbytery*, the court considered the 1986 addition of subsection (c) to 79-201 *Second* and found that the amendment did broaden the definition of "exclusive use" to include minor secular activities incidental to religious purposes. 17 Kan.App.2d at 678.

Caselaw also instructs, however, that the mere occupancy of a residence does not constitute religious use. *Seventh Day Adventist,* 211 Kan. at 694. And it further states that the simple promotion of the well-being of its members is not an exempt use of the property. *Sigma Alpha Epsilon v. Board of Douglas County Comm'rs*, 207 Kan. 514, 519, 485 P.2d 1297 (1971). Thus, it was incumbent upon us to examine the total underlying purpose of the residents' occupancy here to ascertain whether appellants satisfied their burden to establish exemption from taxation. That comprehensive assessment revealed that the actual use of the cabins under scrutiny is for the respite and personal needs of their occupants. BOTA received no compelling evidence, nor does the record before us contain any, to indicate these dwellings also consistently provide an extension of the worship services through such things as bible studies, small group discussions or other variations of spiritual formation. Thus, the residential benefit they provide is their singular purpose, not merely incidental to a greater religious function as would be required to qualify for an exemption under K.S.A. 79-201 *Second*.

We fully recognize that Buildings 15 and 16 no longer possess the residential capabilities they once enjoyed. That is, Building 15 is in limbo awaiting resolution of this case and Building 16 is a shell of its former self reduced solely to a storage facility. While neither cabin is a residence, they, like their former counterparts, do not supplement the religious activities of the campground in any appreciable manner. Thus, their current use is the sole benefit they provide to Kingdom Campground and cannot be classified as merely an incidental use as necessary to receive an exemption.

24

Where the record fails to disclose a use that falls squarely within the statute, we must firmly adhere to the principle that taxation is the rule, exemption is the exception, and all doubts must be resolved in favor of taxation. Bearing that governing principle in mind, we conclude that, despite Kingdom Campground's contention to the contrary, BOTA properly applied the law and denied the campground's request for a tax exemption for the cabins.

DID BOTA ERR IN CONCLUDING THE PARSONAGE WAS NOT EXEMPT?

Kingdom Campground argues that Building 12—Pennock's cabin—should be exempt from taxation because he serves as a minister and regularly occupies the cabin as his residence. It also contends Stone Tabernacle Church owns Building 12. As such, Kingdom Campground believes the cabin meets the requirements of K.S.A. 79-201 *Seventh*.

That subsection of the statute exempts from ad valorem taxation:

"All parsonages owned by a church society and actually and regularly occupied and used predominantly as a residence by a minister or other clergyman of such church society who is actually and regularly engaged in conducting the services and religious ministrations of such society, and the land upon which such parsonage is located to the extent necessary for the accommodation of such parsonage." K.S.A. 79-201 *Seventh*.

In its original order denying exemption, BOTA's findings regarding Building 12 are as follows:

"The Board notes that K.S.A. 79-201 *Seventh* requires that a property to be exempted as a parsonage be 'owned by a church society'. In this case, it is unclear whether the parsonage is owned by Mr. Pennock or if it has been deeded to Stone Tabernacle Church. In either case, the property is not owned by Kingdom Campground,

25

the Applicant in this matter. Thus, the Board concludes the Applicant's request for exemption of Mr. Pennock's dwelling as a parsonage should be denied."

Similarly, in its order denying reconsideration, BOTA concluded that K.S.A. 79-201 *Seventh* requires a church society to own the property. "Mr. Pennock is not a church society. Stone Tabernacle Church may or may not be a church society, but is not a party to this exemption application. Again, the Applicant failed to provide sufficient evidence to show it is the owner of the subject property."

During his testimony, Pennock said Building 12 had been used as his full-time residence for more than four years. Pennock also discussed a series of obituaries to demonstrate he served as a minister. That Pennock occupies and regularly uses Building 12 as his residence is not in dispute. But the predominant issue is the ownership of the cabin.

As stated above, Pennock testified he bought Building 12 from Donald Spencer in 2005 and produced a bill of sale document that stated as much. In 2006, Pennock executed a land lease agreement between himself and Kingdom Campground, which gave him permission to use Building 12 and have his personal property located there. Pennock paid taxes on Building 12 for the past 15 years, despite the fact he primarily lived in Oklahoma until a little more than 4 years before the hearing.

In 2017, Pennock executed a bill of sale document between himself and Stone Tabernacle Church. The bill of sale document states that Pennock conveyed Building 12 "for and in consideration of the sum of ONE DOLLAR ($1) to them in hand paid, the receipt whereof is hereby acknowledged, has sold and by these presents do sell and deliver unto Stone Tabernacle Church the following described personal property. . . ." The bill of sale document states that the rules of Kingdom Campground apply to Building 12, and any changes to the building must be approved by the trustees of Kingdom

Campground. Additionally, the document states that "[t]his structure will serve as the parsonage for the Stone Tabernacle Church, and is hereby entrusted to the Gospel of the Kingdom Campground." Pennock said he served as minister of Stone Tabernacle Church, and it was one of the churches that supported Kingdom Campground.

When asked by the County whether he was aware that K.S.A. 79-201 *Seventh* requires a parsonage to be owned by a church society, Pennock said he could point to other cases where a court has ruled that when a minister could own a parsonage in his or her own name, he or she owns said parsonage for the benefit of the church. "But yes, I agree it should be, now that it has been presented to me. If that had been presented to me by Mr. Hixon in 2017 we could certainly have worded—changed the wording on the document to reflect that."

The County then asked Pennock about the cottage agreement he executed in 2019. Pennock explained that the "document is for any cabin owner to acknowledge that they understand all the rules and that that building can be demolished at any time and that it's, you know, controlled by the church and owned by the church." And despite there being no listed address on the agreement, Pennock said the agreement referred to Building 12. Stone Tabernacle Church's name does not appear on the document.

But again, the County's exhibits admitted during the hearing contained the property record cards for buildings inventoried on Kingdom Campground. The property record cards for Building 12 listed Kingdom Campground as the owner in 2017, 2018, and 2019.

As stated above, this court shall grant relief if it determines that BOTA's "action is based on a determination of fact, made or implied by the agency, that is not supported to the appropriate standard of proof by evidence that is substantial when viewed in light of the record as a whole." K.S.A. 77-621(c)(7). Based on the evidence adduced at the

27

hearing, BOTA's conclusion regarding Building 12 is flawed. In our view, the property record cards listing Kingdom Campground as the owner of the building, taken in conjunction with the cottage agreement which vests the campground with complete control over the building's functions and even its continued existence, reflect ownership properly lies with Kingdom Campground. BOTA's conclusion to the contrary and refusal to grant an exemption regarding Building 12 in accordance with K.S.A. 79-201 *Seventh* is reversed.

DID BOTA ERR IN CONCLUDING THE REMAINING REAL ESTATE WAS NOT EXEMPT?

In BOTA's order denying reconsideration, it concluded the remaining real estate consisted of Buildings 1, 2, 3, 4, 8, 9, and 10. It originally also included Building 7 in that Order despite the fact that the structure was stipulated as exempt. BOTA later corrected the oversight in an order nunc pro tunc.

In its original order, BOTA concluded the following regarding the remaining real estate:

"The Board finds the Applicant has failed to demonstrate that the other real estate included within the subject property is used 'exclusively' for religious purposes (K.S.A. 79-201 *First* and *Second*), nor is it owned 'by a church or nonprofit religious society or order which is exempt from federal income taxation pursuant to section 501(c)(3) of the federal internal revenue code of 1986' (K.S.A. 79-201 *Tenth*). The Board concludes the application for exemption from ad valorem taxation for the remaining real estate should be denied."

BOTA added information concerning its rationale for denying exemption in its order denying reconsideration:

"Per the evidence provided at the hearing, Item #2 is an unfinished dormitory, Item #9 consists of restrooms that are run-down and rodent infested, and Item #8 is a

28

storage building. The use of Item #8 as a storage of religious items is disputed by the County and evidence of its use was not provided. Photos of beds were provided and indicated as located in Items #1 and #2. For the remaining items, only photos of the outside of the buildings were provided. No photographs of the contents of the storage buildings were provided and the County was prohibited from inspecting these buildings by the Applicant. The Board finds the photographs provided to be insufficient evidence of the use of the referenced properties."

To recap, Building 1 is known as the House by the Road. Pennock testified "the single, sole purpose," of Building 1 has always been a dormitory, though there had occasionally been services of some sort held there in the past. A photograph admitted during the BOTA hearing showed a bedroom inside Building 1.

Pennock identified Building 2 as the White Building. Pennock said Kingdom Campground used the bottom portion of Building 2 for dormitories and the unfinished upstairs for storage of building supplies to support the other buildings on the property. Interior and exterior photographs were admitted during the BOTA hearing.

Pennock said Building 3, known as Eleta Kaye Spencer's Cabin, had "been used since 2003 for [a] dormitory as well and it has been in the Campground's name since 2003 and recorded at the courthouse since 2003." A photograph of the exterior of Building 3 was admitted during the BOTA hearing. Building 4 is known as the Restaurant. Pennock described the building as a small dining hall used for meals or snacks where people can go get food as needed outside of the fellowship hall where regular meals are served. As Kingdom Campground points out, this building serves a functionally equivalent purpose as Building 6—the Dining Hall. Building 6 was stipulated as exempt, while Building 4 was not.

Building 8 is known as either the Storage Building or the Blue Building. Pennock said Kingdom Campground used this building to store large equipment, lumber, and other

maintenance supplies used to maintain the grounds and buildings. Building 9 had restrooms and showers and was used for that purpose. Building 10 is known as the Guest House. Pennock testified Kingdom Campground used this building predominantly for storage, though Pennock said a couple of people had rooms in there. An interior photograph was admitted during the BOTA hearing.

During his testimony, the County asked Hixon about these structures:

"[THE COUNTY:]  Now, in addition to the seven structures that are essentially living quarters and in addition to the four structures, Nos. 5, 6, 17 and 7, what other buildings on the property–what have you observed about the other buildings? How many of them, if any, are in your opinion useable for religious purposes?

"[HIXON:]  They, they all looked at the time I was there to be derelict. Now I will say though that last week or the week before I did stop by there, I was going by on the highway and I stopped in and we'd gotten these pictures and one of them was the inside of that public restroom building. And I got to tell you, you did a lot of work in there.

"It really looks nice compared to the time I was in there two years ago. The rodents and spiders owned that building and now it looks–it looks like, you know, I wouldn't be afraid to go in there. But most of those buildings did not look–and I never once challenged or questioned whether or not this was a going concern in prior years, in the past history of this property and it's got a rich history. And I never once questioned that.

"My concern was for what's happening now and it did not look to me like this property was being used for any religious purposes. I've since come to believe that some of these buildings do get used for religious purposes, but I still believe that cabins and some of the other buildings that are pretty much unusable, we've seen a couple of pictures of some of the rooms, but I don't know. I wasn't allowed to go inside and look at the entire interior of the properties.

30

"And in the appraisal profession there's, there's the principle of conformity which basically says that if the outside–whatever the outside looks like probably the inside looks the same. My dad had a saying that you don't put a $40 saddle on a $10 horse.

"So basically if the outside looks rundown probably the inside is too. And I was going on, on that assumption. But I will have to say they have been out there and they have been working on it, it looks like, recently."

Hixon did not testify about the buildings specifically, except for Building 9—the building used for showers and restrooms. His other testimony also fails to make specific conclusions regarding the buildings. Instead, he essentially made a blanket statement conclusion regarding the buildings, deeming them unusable based on their outward appearance due to the principle of conformity. Hixon also spoke briefly about exterior photographs of some of the buildings he had taken, but that testimony primarily identified the buildings and did not add more.

As previously stated, the party requesting the exemption has the burden of establishing its eligibility under the applicable statutory provision. *In re Tax Appeal of Genstler Eye Center & Clinic*, 40 Kan.App.2d 411, 414, 192 P.3d 666 (2008). "[T]ax exemption statutes are interpreted strictly in favor of imposing the tax and against allowing an exemption for one that does not clearly qualify." *In re Tax Exemption Application of Mental Health Ass'n of the Heartland*, 289 Kan. 1209, 1211, 221 P.3d 580 (2009). "All doubts concerning exemption are to be resolved against the exemption and in favor of taxation." *In re Tax Appeal of Scholastic Book Clubs, Inc*., 260 Kan. 528, 532, 920 P.2d 947 (1996).

In its Orders, BOTA concluded Kingdom Campground's exemption application must be denied because it failed to provide "coherent, persuasive, or consistent evidence that the ownership [of the remaining property] is vested in the Appellant and/or of their exclusive use for religious purposes." Following a conscientious review of the record, our conclusion mirrors that reached by BOTA. While these structures certainly serve

31

important roles in their own right, their classification suffers the same infirmity as their residential counterparts analyzed under the first issue. That is, their primary purpose does not place them under the exclusively religious use umbrella nor is their non-religious function merely incidental so as to qualify for an exemption under the exception. Kingdom Campground carried the burden to put forth evidence that placed them within the reach of K.S.A. 79-201 *Second*. They failed to sustain that burden. Where taxation is the rule in the absence of compelling evidence to demonstrate an exemption is warranted, BOTA's denial of the campground's request must be upheld.

### DID BOTA'S RULING VIOLATE THE UNIFORM AND EQUAL REQUIREMENT OF THE KANSAS CONSTITUTION?

Finally, Kingdom Campground encourages us to reverse this case and order additional proceedings so that BOTA may consider the campground's exemption requests in uniformity with the manner in which it historically weighed similar applications from other religious entities. Kingdom Campground contends it did not receive the benefit of such uniformity during the assessment BOTA conducted at its original hearing which resulted in an unconstitutional disparity.

Kingdom Campground presented this issue to the Board for the first time in its petition for reconsideration. At that time, it requested an evidentiary hearing to flesh out its lack of uniformity claim and provided documentation in an effort to bolster its assertion. The problem with Kingdom Campground's chosen course of action, as noted by BOTA when denying the petition, is that the campground had a full, unfettered opportunity during its original hearing to encourage BOTA to adhere to uniformity principles when analyzing its exemption requests but neglected to do so. According to BOTA, that delayed plea resulted in an abandonment of the issue for purposes of Kingdom Campground's current application. We agree. However, our decision is not intended to foreclose Kingdom Campground from presenting this matter in conjunction

32

with future exemption applications. It simply means we decline to reverse this case for litigation of an issue that Kingdom Campground had the opportunity to properly raise at the original hearing but then failed to seize that opportunity.

Affirmed in part, reversed in part, and remanded with directions.